**No. 15-3175**

---

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE SEVENTH CIRCUIT**

---

WILLIAM AVERY,

Plaintiff-Appellant,

v.

CITY OF MILWAUKEE, et al.,

Defendants-Appellees.

---

Appeal From the United States District Court
For the Eastern District of Wisconsin
Case No. 11 CV 408
The Honorable Judge Rudolph T. Randa

---

BRIEF OF THE PLAINTIFF-APPELLANT
WILLIAM AVERY

---

John L. Stainthorp
Janine L. Hoft
Ben H. Elson
People's Law Office
1180 N. Milwaukee Ave.
Chicago, IL 60642
(773) 235-0070

**CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Pursuant to Seventh Circuit Rule 26.1, counsel for Plaintiff-Appellant William Avery state as follows:

1. The full name of every party that the undersigned attorneys represent in this case is: William Damon Avery.

2. The names of all law firms and the partners and associates that appeared for the party now represented by us in the trial court or are expected to appear in this Court are:

| | |
|---|---|
| John L. Stainthorp<br>Janine L. Hoft<br>Ben H. Elson<br>People's Law Office<br>1180 N. Milwaukee Ave.<br>Chicago, IL 60642 | Jon Loevy<br>Gayle Horn<br>Heather Lewis Donnell<br>Loevy & Loevy<br>312 N. May Street<br>Suite 100<br>Chicago, IL 60607 |

3. The parent corporations and any publicly held companies that own ten percent or more of the stock of the party represented by the attorneys: N/A.

Respectfully submitted,

s/ John L. Stainthorp
John L. Stainthorp
Janine L. Hoft
Ben H. Elson
People's Law Office
1180 N. Milwaukee Ave.
Chicago, IL 60642
*Attorneys for Plaintiff-Appellant William Avery*

## TABLE OF CONTENTS

**JURISDICTIONAL STATEMENT** . . . . . 1

**ISSUES PRESENTED FOR REVIEW** . . . . . 2

**STATEMENT OF THE CASE** . . . . . 3

**PROCEDURAL HISTORY** . . . . . 3

**FACTS** . . . . . 7
a. The Death of Maryetta Griffin . . . . . 7
b. The Interrogation of William Avery . . . . . 8
c. The Fabrication of Evidence Inculpating Avery in the Murder . . . . . 9
d. Avery is Prosecuted and Convicted on Drug Charges . . . . . 11
e. Avery is Prosecuted and Convicted for the Murder of Maryetta Griffin . . . . . 11
f. Serial Killer Walter Ellis . . . . . 12
g. The Case Against Avery Falls Apart . . . . . 13
h. Two of the Three Jailhouse Informants Recant, the Third Pleads the Fifth . . . . . 14
1. Kimbrough . . . . . 14
2. Randolph . . . . . 15
3. Kent . . . . . 15
i. The Jailhouse Informants Persist with Their Recantations at the Civil Trial . . . . . 16
j. The Policy and Practice of the Milwaukee Police Department . . . . . 16
k. Jury instructions . . . . . 17
l. Verdict . . . . . 18

**SUMMARY OF THE ARGUMENT** . . . . . 18

**STANDARDS OF REVIEW** . . . . . 20

a. Rule 50(b) . . . . . 20
b. Rule 59(e) . . . . . 20
c. Summary Judgment . . . . . 21
d. Conforming Pleadings to the Evidence . . . . . 21

**ARGUMENT** . . . . . 22

1. The Fabrication of Plaintiff's Inculpatory Statement Constituted a Viable Due Process Claim for Which Defendant Police Officers Phillips and Hernandez Were Properly Found Liable . . . . . 22
a. A Police Officer Who Fabricates Evidence That Deprives a Person of Liberty Violates Due Process . . . . . 22

b. Avery Established a Violation of His Due Process Rights by Defendants Phillips and Hernandez That Caused His Imprisonment. . . . . . . . . . . . . . . . . . . . 27

2. Plaintiff's Due Process Claim Was Not Eliminated by the Possibility of Bringing a Malicious Prosecution Claim under Wisconsin Law. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

3. The Fabrication of Evidence by Phillips and Hernandez Was Not Immunized by Their Subsequent Testimony at Avery's Criminal Trial. . . . . . . . . . . . . . . . . . . . . . . . . 33

4. The Court Erred in Granting Summary Judgment to All Defendants on the *Brady* Claim. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

5. The Court Erred in Refusing to Allow the Jury to Determine the *Brady* Claim Based on the Evidence Adduced at Trial. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

6. Defendants Waived Any Argument That the Fabrication of Evidence Claim Did Not Constitute a Viable Due Process Claim by Failing to Move on this Issue in Their Rule 50(a) and Post-trial Motions. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

**CONCLUSION**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

## TABLE OF AUTHORITIES

### CASES

*Armstrong v. Daily*, 786 F.3d 529 (7th Cir. 2015).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25, 31

*Bank of Waunakee v. Rochester Cheese Sales, Inc.*, 906 F.2d 1185 (7th Cir. 1990). . . . . . . 20, 21

*Brady v. Maryland*, 373 U.S. 83 (1963). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37, 38, 39, 40

*Brooks v. City of Chicago*, 564 F.3d 830 (7th Cir. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Brown v. Miller*, 519 F.3d 231 (5th Cir. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Buckley v. Fitzsimmons*, 20 F.3d 789 (7th Cir. 1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Burks v. Union Pac. R.R. Co.*, 793 F.3d 694, 700 (7th Cir. 2015).. . . . . . . . . . . . . . . . . . . . . . . . 21

*Castellano v. Fragozo*, 352 F.3d 939 (5th Cir. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Chavez v. Martinez*, 538 U.S. 760 (2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

*Ciomber v. Cooperative Plus, Inc.*, 527 F.3d 635 (7th Cir. 2008).. . . . . . . . . . . . . . . . . . . . . . . 34

*Cole v. Carson*, 802 F.3d 752 (5th Cir. 2015). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Collins v. Kibort*, 143 F.3d 331 (7th Cir. 1998).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Cosgrove v. Bartolotta*, 150 F.3d 729 (7th Cir. 1998).. . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 21

*Devereaux v. Abbey*, 263 F.3d 1070 (9th Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Dominguez v. Hendley*, 545 F.3d 585 (7th Cir. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . 25, 31, 36

*Fields v. Wharrie*, 740 F.3d 1107 (7th Cir. 2014). . . . . . . . . . . . . . . . 6, 23, 24, 31, 33, 34, 35, 36

*Foman v. Davis*, 371 U.S. 178 (1962). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*Foster v. DeLuca*, 545 F.3d 582 (7th Cir. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Fox v. Hayes*, 600 F.3d 819 (7th Cir. 2010).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Gauger v. Hendle*, 349 F.3d 354 (7th Cir. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*Giglio v. United States*, 405 U.S. 150 (1972). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*Grayson v. City of Chicago*, 317 F.3d 745, 749 (7th Cir. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Halsey v. Pfeiffer*, 750 F.3d 273 (3d Cir. 2014).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26, 36

*Harlow v. Fitzgerald*, 457 U.S. 800 (1982). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*Harrell v. Cook*, 169 F.3d 428 (7th Cir. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Jones v. Chicago*, 856 F.2d 985 (7th Cir. 1988). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25, 31, 35, 36

*Kier v. Commercial Union Insurance Cos.*, 808 F.2d 1254 (7th Cir. 1987). . . . . . . . . . . . . . . . 41

*Krieg v. Dayton-Hudson Corp.*, 104 Wis. 2d 455 (Wis. 1981). . . . . . . . . . . . . . . . . . . . . . . 32, 33

*Kyles v. Whitley*, 514 U.S. 419 (1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*Limone v. Condon*, 372 F.3d 39 (1st Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Manning v. Dye*, 2003 U.S. Dist. LEXIS 630 (N.D. Ill. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . 39

*Manning v. Miller*, 355 F.3d 1028 (7th Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*Massey v. Blue Cross-Blue Shield of Ill.*, 226 F.3d 922 (7th Cir. 2000). . . . . . . . . . . . . . . . . . . . 20

*McCarty v. Pheasant Run, Inc.*, 826 F.2d 1554 (7th Cir. 1987). . . . . . . . . . . . . . . . . . . . . . . . . 42

*Meyer v. Ewald*, 66 Wis. 2d 168 (1974). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Monroe v. Pape*, 365 U.S. 167 (1961). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34, 35

*Mooney v. Holohan*, 294 U.S. 103 (1935). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 37

*Napue v. Illinois*, 360 U.S. 264 (1959). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 38

*Newsome v. McCabe*, , 256 F.3d 747 (7th Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . 30, 31, 38, 39

*Newsome v. McCabe*, 319 F.3d 301 (7th Cir. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Oto v. Metropolitan Life Insurance Co.*, 224 F.3d 601 (7th Cir. 2000). . . . . . . . . . . . . . . . . . . . 20

*Petty v. Chicago*, 754 F.3d 416 (7th Cir. 2014). . . . . . . . . . . . . . . . . . . . . . . . . . 4, 23, 25, 31, 36

*Pierce v. Gilchrist*, 359 F.3d 1279 (10th Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Pyle v. Kansas*, 317 U.S. 213, 215-16 (1942). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133 (2000). . . . . . . . . . . . . . . . . . . . . 7

*Rehberg v. Paulk*, 132 S. Ct. 1497 (2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31, 33

*Ricciuti v. N.Y.C. Transit Authority*, 124 F.3d 123 (2d Cir. 1997). . . . . . . . . . . . . . . . . . . . 26, 36

*Romo v. Gulf Stream Coach, Inc.*, 250 F.3d 1119 (7th Cir. 2001). . . . . . . . . . . . . . . . . . . . 20, 21

*Rothwell Cotton Co. v. Rosenthal & Co.*, 827 F.2d 246 (7th Cir. 1987). . . . . . . . . . . . . . . . . 41, 42

*Saunders-El v. Rohde*, 778 F.3d 556 (7th Cir. 2015). . . . . . . . . . . . . . . . . . . . . . . 6, 22, 23, 25, 30

*Sheehan v. Donlen Corp.*, 173 F.3d 1039 (7th Cir. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Stinson v. Gauger*, 799 F.3d 833 (7th Cir. 2015). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 23, 24

*Strickler v. Greene*, 527 U.S. 263 (1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*Strid v. Converse*, 111 Wis. 2d 418 (1983). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Sunstream Jet Express v. International Air Serv. Co.*, 734 F.2d 1258 (7th Cir. 1984). . . . . . . . 21

*Tarantino v. Griebel*, 9 Wis. 2d 37 (1960). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Tennant v. Peoria & P. U. R. Co.*, 321 U.S. 29 (1944). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Thompson v. City of Chicago*, 722 F.3d 963 (7th Cir. 2013. . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*Triad Associates v. Robinson*, 10 F.3d 492 (7th Cir. 1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*United States v. Agurs*, 427 U.S. 97, 107 (1976). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*United States v. Bagley*, 473 U.S. 667, 676 (1985). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*United States v. Boyd*, 55 F.3d 239 (7th Cir. 1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*United States v. Lochmondy*, 890 F.2d 817 (6th Cir. 1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Wallace v. City of Chicago*, 440 F.3d 421 (7th Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Washington v. Wilmore*, 407 F.3d 274 (4th Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . 26, 36

*Wesley v. Nickels*, 167 Wis. 2d 487 (Wis. Ct. App. 1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Whispering Springs Corp. v. Town of Empire*, 183 Wis. 2d 396 (Wis. Ct. App. 1994). . . . . . . 32

*Whitlock v. Brueggemann*, 682 F.3d 567 (7th Cir. 2012) . . 4, 6, 23, 24, 27, 29, 31, 33, 34, 35, 36

*Willis v. Lepine*, 687 F.3d 826 (7th Cir. 2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

*Wilson v. Lawrence Cnty.*, 260 F.3d 946 (8th Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Yarris v. County of Delaware*, 465 F.3d 129 (3d Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*Yelk v. Seefeldt*, 35 Wis. 2d 271 (1967). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Zelinski v. Columbia 300, Inc.*, 335 F.3d 633 (7th Cir. 2003). . . . . . . . . . . . . . . . . . . . . . . . 20, 43

*Zimmerman v. Chicago Board of Trade*, 360 F.3d 612 (7th Cir. 2004). . . . . . . . . . . . . . . . . . . . 7

## STATUTES AND RULES

42 U.S.C.§ 1983. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 3, 34

28 U.S.C. § 1291. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

28 U.S.C. § 1331. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Fed. R. Civ. P. 15(b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

Fed. R. Civ. P. 50(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 19, 20, 41, 42

Fed. R. Civ. P. 50(b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42, 43

Fed. R. Civ. P. 54(b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 41

Fed. R. Civ. P. 56(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Fed. R. Civ. P. 59(e). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 20, 21, 28, 41, 42

Wis. Stat. § 893.80. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 32, 33

## OTHER AUTHORITIES

1 Dan B. Dobbs, The Law of Torts § 182 (2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

## JURISDICTIONAL STATEMENT

The district court had jurisdiction of this matter seeking relief under 42 U.S.C. § 1983 *et seq.*, pursuant to 28 U.S.C. § 1331. This court has jurisdiction pursuant to 28 U.S.C. § 1291.

The date of the judgment sought to be reviewed is November 19, 2015, (Dkt. 169), which is a final judgment pursuant to Fed. R. Civ. P. 54(b) that adjudicates all of the claims with respect to Plaintiff William Avery and finds that there is no just reason to delay the entry of judgment. An Amended Notice of Appeal as to this judgment was filed on November 20, 2015.

Plaintiff-Appellant William Avery had originally filed a Notice of Appeal on September 30, 2015 appealing from the order of September 29, 2015 which entered judgment against William Avery on all of his claims and in favor of all Defendants. Dkt. 156. At the time of filing this notice of appeal Plaintiff's counsel had overlooked that there were additional claims of William Avery's children that had been dismissed without prejudice and which potentially prevented this court from having jurisdiction over the case.[1] Once Plaintiff's counsel realized this issue he filed a motion for limited remand, for the purpose of requesting that the district court enter a Rule 54(b) final judgment finding that there was no just reason for delay. 7C Dkt. 10. This court granted that motion (7C Dkt. 15), counsel filed a motion in the district court requesting a 54(b) judgment (Dkt. 166), and the district court entered a Rule 54(b) judgment. Dkt. 168, 169. No motion for alteration of the November 19, 2015 judgment or for a new trial was filed. On November 20, 2015, Plaintiff-Appellant filed the Amended Notice of Appeal, Dkt. 170, which this court subsequently held was unnecessary. *See* Case No. 15-3624, Dkt. 9.

[1]Present counsel have never represented Avery's children. The case was originally filed by different counsel who subsequently withdrew. Present counsel then undertook the representation of William Avery but not his children, who remained unrepresented.

## ISSUES PRESENTED FOR REVIEW

Whether police officers who fabricate an inculpatory statement from a criminal defendant that is subsequently used to deprive that person of liberty are liable in a due process claim?

Whether the existence of a state law malicious prosecution claim bars a Plaintiff from prevailing on a due process claim for fabrication of evidence?

Whether a police officer who fabricates an inculpatory statement can immunize this fabrication by subsequently testifying to the fabricated statement?

Whether the district court was correct in granting summary judgment to the Defendants on Plaintiff's *Brady* claims where Plaintiff knew that evidence had been fabricated but Defendants concealed both the manner of fabrication and that a witness had admitted, prior to the criminal trial, that his statement was a lie?

Whether the district court abused its discretion in refusing to allow Plaintiff to conform his pleadings to the evidence when additional evidence at trial showed several *Brady* violations?

Whether Defendants waived any argument that the fabrication of evidence by the Defendants was not an actionable due process violation?

## STATEMENT OF THE CASE

### PROCEDURAL HISTORY

In 2004 Plaintiff William Avery was arrested for, and subsequently wrongly convicted of, the 1998 homicide of Maryetta Griffin. Dkt. 1, 42. Several years after he was convicted, semen recovered from Ms. Griffin's body was tested for DNA (at the request of Plaintiff), and was found to be from a serial killer, Walter Ellis, who at that time was charged with seven similar murders. *Id.* Based on this new evidence and the absence of any physical evidence tying him to the murder, Mr. Avery's conviction was vacated and he was released from prison.

Plaintiff then filed this action under 42 U.S.C.§ 1983, asserting that Milwaukee Police Department detectives had denied him due process by fabricating inculpatory evidence and concealing exculpatory evidence, and that policies and practices of the City of Milwaukee were the moving force behind these constitutional violations. *Id.* The fabricated evidence was the creation of admissions that some of the Defendants claimed Avery had given to them, as well as created statements the Defendants obtained from three jailhouse informants who claimed that Avery had admitted the homicide. The concealed exculpatory evidence was the coaching and manipulation of the jailhouse informants by several Defendants to obtain the statements inculpating Avery. *Id.*

All Defendants moved for summary judgment. Dkt. 69, 70. The motion failed to address the viability of an evidence fabrication claim, arguing as to the due process claim only that it could not be maintained as a *Brady* claim. Dkt. 70 at 10-20. The district court denied the motion as to the fabrication of evidence but granted it as to the *Brady* claims. Dkt. 82. As to the fabrication claims, the court noted that the Defendants had failed to address the pertinent law,

and that "[t]he Seventh Circuit has 'consistently held that a police officer who manufactures false evidence against a criminal defendant violates due process if that evidence is later used to deprive the defendant of her liberty in some way,'" quoting *Whitlock v. Brueggemann*, 682 F.3d 567, 580 (7th Cir. 2012) (Dkt. 82 at 9); that Plaintiff's claims were not for malicious prosecution, (*id.* at 10-11); and that "[t]his is, quite clearly, a fabrication case, the hallmark of which is that the defendants 'manufactured evidence that they knew to be false,'" quoting *Petty v. Chicago*, 754 F.3d 416, 423 (7th Cir. 2014). Dkt. 82 at 12. As to Plaintiff's claim that the Defendants "violated due process by not disclosing the fact that they coached and manipulated the jailhouse informants into falsely implicating him in the Griffin murder," *id.* at 12-13, the court granted the Defendants' motion on the grounds that "the duty to disclose under *Brady* 'drops out' because Avery knew what he said (or didn't say) to the jailhouse informants." *Id.* at 13. The court noted that Defendant City did not challenge Plaintiff's policy and practice claim, other than to argue that it failed because the underlying due process claims failed. *See* Dkt. 70 at 22. The court held that because some of the due process claims survived, the policy and practice claim also survived. Dkt. 82 at 14.

Plaintiff proceeded to trial against six officers and the City. At the start of jury selection the court advised the jury panel, with the consent of the Defendants, that "this case involves the imprisonment of the Plaintiff, Mr. Avery, William Avery, for a crime he didn't commit." T/S Voir Dire Excerpt 1. At the close of Plaintiff's case the Defendants made a motion for judgment as a matter of law pursuant to Fed. R. Civ. P. 50(a), arguing solely that Plaintiff had failed to prove that any fabrications of inculpatory statements by the Defendants were a proximate cause of his conviction and imprisonment. Dkt. 130, 131. While the motion asserted that it was made

on behalf of all Defendants, including the City (Dkt. 130), the memorandum in support of the motion made no argument as to the policy claim against the City. Dkt. 131. The Plaintiff also made a motion that the court reconsider its dismissal of the *Brady* claims, based on the evidence introduced at trial. Dkt. 133. The court denied both motions. Dkt. 134. At the close of all the evidence Plaintiff again requested that the court reinstate the *Brady* claims and allow the jury to decide them, based on the evidence at trial. T/S 1297. The court denied the motion. *Id.* The jury found in Plaintiff's favor and against Defendants Hernandez and Phillips on the fabrication, conspiracy and failure to intervene claims, and against the City of Milwaukee on the policy claim, and awarded one million ($1,000,000) dollars in damages. Dkt. 137. The jury found in favor of the remaining Defendants. *Id.*

Defendants Hernandez, Phillips and Milwaukee filed a post-trial motion, citing Fed. R. Civ. P. 59(e), which argued that *Wallace v. City of Chicago*, 440 F. 3d 421, 423 (7th Cir. 2006), held that a plaintiff could not recharacterize a coerced confession claim as a procedural due process violation and that Plaintiff had not brought a substantive due process claim (Dkt. 147 at 4-10); that the evidence did not support the finding that Avery's fabricated confession was a proximate cause of his conviction (*id.* at 10-14); and that because no individual defendants were properly found liable the policy claim also must fail. *Id.* at 14-21. The district court noted that Defendants did not argue that the jury lacked a sufficient evidentiary basis for returning a verdict in favor of Plaintiff on his due process and policy claims, and stated that it would consider the causation argument under rule 50(b), even though it was incorrectly titled. *Id.* at 6. Defendants filed no motion for a new trial. Plaintiff filed no post-trial motions as to the Defendants who

prevailed before the jury and is not presenting any arguments in this appeal that the judgments in favor of those Defendants on the fabrication claims should be overturned.[2]

As to the due process claim, the court noted that "[a]t summary judgment, the Court found that Avery's due process claim was viable pursuant to cases such as *Whitlock v. Brueggemann*, 682 F.3d 567 (7th Cir. 2012), and *Fields v. Wharrie*, 740 F.3d 1107 (7th Cir. 2014)," Dkt. 155 at 6-7, but held that the subsequent opinions in *Saunders-El v. Rohde*, 778 F.3d 556, 560 (7th Cir. 2015), and *Stinson v. Gauger*, 799 F.3d 833 (7th Cir. 2015), showed that "there are mixed signals coming from the Seventh Circuit regarding the viability of due-process fabrication claims against police officers." Dkt. 155 at 9. The court then held that "Avery's claim 'sounds' in malicious prosecution," (*id.* at 10), and that since he had a potential malicious prosecution claim under Wisconsin law, he "is not entitled to relief on his due process claim." *Id.* The court further held that "because Hernandez and Phillips testified in accordance with their 1998 report: in short, that Avery confessed to killing Maryetta Griffin . . . even if Avery's due process claim was actionable, Hernandez and Phillips would be entitled to absolute immunity." *Id.* at 12. Thus, the court granted the motion as to Phillips and Hernandez and entered judgment in their favor. Based on the granting of the individual Defendants' motion, the court also granted the City's motion and entered judgment in its favor. As to causation, the court rejected the Defendants' argument, ruling that "[b]ased on the evidence presented, the jury could and did

[2]Plaintiff is, however, arguing that it was improper for the court to grant summary judgment on the *Brady* claims, and that it was additional error to fail to reinstate these claims after evidence at trial demonstrated that Defendants, and in particular Defendants Heier, Armbruster and Hein, had failed to disclose exculpatory evidence. *See post*, Arguments 4, 5.

draw reasonable inferences from that evidence to conclude that Avery's conviction was a foreseeable consequence of fabricating a confession." *Id.* at 15.

**FACTS**

**a. The Death of Maryetta Griffin**

On February 17, 1998 the body of Maryetta Griffin was found in a derelict garage behind 3032 N. 7th Street in Milwaukee. Ex.1009; T/S 288-89, 541. Ms. Griffin, who went by the name Mercedes, was a drug abuser and known prostitute who often lived on the streets; she had been strangled and sexually assaulted. T/S 452-53. The evening before her body was found, Ms. Griffin and other prostitutes, including Joanne Hollins, had been at a drug house located at 2474 N. Palmer, Milwaukee, where Plaintiff William Avery, who helped run the house with Lorenzo Frost, was present. T/S 96-98, 171. Ms. Griffin left the house between 5:30-6:00 p.m. on February 16, and Mr. Avery did not see her again. T/S 96.[3] Mr. Avery remained at the house and around 8 to 8:30 a.m. the next morning he received a phone call from Joanne Hollins that Mercedes had been found dead. T/S 98-100. Mr. Avery had nothing to do with Mercedes' death, did not have sex with her on February 16, and was not involved in any argument with her. T/S 100-03, 127, 161.

---

[3]Where the jury decides in favor of the Plaintiff, as it did on Avery's claim that Defendants Hernandez and Phillips falsely claimed that he had made inculpatory admissions as to the homicide, the facts are viewed in the light most favorable to the Plaintiff, with all reasonable inferences drawn in his favor. *Collins v. Kibort*, 143 F.3d 331, 335 (7th Cir. 1998). The court "may not weigh the evidence or pass on the credibility of witnesses, nor may we substitute our view of the contested evidence for the jury's." *Zimmerman v. Chicago Board of Trade*, 360 F. 3d 612, 623 (7th Cir. 2004), citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). *See also Sheehan v. Donlen Corp.*, 173 F.3d 1039, 1043 (7th Cir. 1999) ("Overturning a jury verdict is a 'hard row to hoe.'").

**b. The Interrogation of William Avery**

On Friday, March 20, 1998, Plaintiff was contacted by Milwaukee police officers who asked him to come in to talk to them. T/S 94. The following Monday, March 23, he voluntarily went to the Central Investigations Bureau (CIB), where he was questioned by Defendants Phillips and DeValkanere about the death of Ms. Griffin. T/S 101-03, 543. These detectives asked him whether he killed Ms. Griffin or knew who did, and prepared a report, Ex.11A, that purported to describe the interview. T/S 102. When these Defendants' shifts ended the questioning was taken over by Defendants Hernandez and Hein.[4] T/S 103. At numerous points during the questioning Avery asked for a lawyer but was told "it don't work that way." T/S 104-05. On several occasions Avery told Hein and Hernandez that he did not wish to talk to them; at around 10:30 p.m. on the night of March 23 he was sent to the City jail holding cells for the night. T/S 104-06.[5]

The next day, March 24, the interrogation of Avery continued with questioning by Defendants Phillips and Hernandez. T/S 106. Both Phillips and Hernandez approached the interrogation with the theory that when violence erupts between a customer and a prostitute the prostitute could be the one initiating the conflict, and knew that in this case Ms. Griffin had likely robbed someone else shortly before she was killed. T/S 226, 230, 479-80. Hernandez had a hunch that Avery was involved in the homicide (T/S 481), and Phillips likely shared with Hernandez that he believed it was suspicious that during questioning on March 23 Avery said he knew about Ms. Griffin's death at 8 to 8:30 a.m when the body was not discovered by police until 11:00 a.m.; he believed that was a highly incriminating fact because it suggested Avery had

---

[4]Detective Kathy Hein subsequently changed her last name to Spano. T/S 539.

[5]There was an outstanding warrant for Avery which was the basis for his detention.

inside knowledge about the homicide. T/S 235-38, 479. In fact, Avery's statement as to when he was aware of the death was not suspicious in the slightest because several people in the neighborhood knew about the body by 8 a.m., and DeValkanere had prepared a police report recording this. T/S 244-45, 281-82; Ex.1010.

**c. The Fabrication of Evidence Inculpating Avery in the Murder**

During the questioning, Hernandez and Phillips accused Avery of killing Ms. Griffin, of being involved with Lorenzo Frost in the killing, and presented him with a hypothetical scenario where he woke up, found Mercedes going through his pockets, she pulled away from him, he chased her, she fell down the stairs and broke her neck. T/S 107.[6] Avery denied that this is what had happened and asked for a lawyer several times. T/S 107-10, 199. Despite the fact that Avery denied that this was how Mercedes had been killed, the officers prepared two separate reports which falsely reported that Avery had said that he was awakened by Mercedes going through his pockets, pulling out his money, that he was startled and said "what are you doing," that Mercedes pulled and ran to the stairs, that he didn't remember what happened after that, that Lorenzo Frost called and Avery told him "I think I killed this bitch," and that he was responsible for killing Mercedes, but just didn't remember how. T/S 109-10, 127; Ex.11C, Ex.11D, Appendix pp. 40-42. Both of the police reports recording this statement are fabricated and false. *Id.* Hernandez told Avery that they were going to make him out to be a monster in the newspaper with Phillips subsequently telling Avery, "choo choo, you made the newspaper." T/S 114, 200.

---

[6]Phillips initially denied that he ever used hypotheticals while interrogating suspects but then, after being impeached with his deposition testimony, admitted that he did, but claimed he did not do so on this occasion. T/S 216-17.

The statements as recorded in the police reports were highly inculpatory and were a crucial part of the prosecution of Avery for murder. T/S 250, 488-89, 529. There was no question that Ms. Griffin was murdered and that in the statement allegedly made by Avery to Hernandez and Phillips he admitted responsibility for that murder. T/S 523-24. The police reports were used in multiple ways. They were introduced into evidence at the criminal trial of Mr. Avery and used to secure his conviction (T/S 234, 253, 256, 472-73, 495, 523-24, 1222-24); they were provided to the prosecutors who relied on the accuracy of the reports to determine whether to bring criminal charges (T/S 269, 467, 473); other officers would rely upon them in conducting their own investigations (T/S 232, 470-73); they were provided to the media that relied on them to be accurate (233, 472-73); and the fabricated police reports of Hernandez and Phillips were the basis for an article in the Milwaukee Journal Sentinel entitled “Man Admits to Killing, Report Says,” which stated that Avery “has confessed to the strangulation of a woman who visited the house in the days before her killing, according to a police report.” Ex.1042; T/S 114-16, 251-52. The article featured a photograph of Avery, and also noted that Griffin’s body “was found in the same area as the bodies of 11 women who were killed since 1986. Most of the women were prostitutes and crack addicts who engaged in dope dating, exchanging drugs for sex.” Ex.1042.

The only manner in which Milwaukee police would record the statements of suspects was through police reports; there was no recording of statements by audio, video, stenographer or having the suspect write out the statement himself. T/S 206, 212-13, 462-65. Thus, the only record made of interrogations was the record that was made by the detective. T/S 464. The police reports of Hernandez and Phillips, Ex.11C and 11D, are the only reports which claim that Avery made admissions to police as to the murder of Ms. Griffin. T/S 252, 527.

**d. Avery is Prosecuted and Convicted on Drug Charges**

Avery was not charged with the homicide of Ms. Griffin in 1998, but was charged and convicted of various drug offenses and was sentenced to prison. T/S 117. While he was incarcerated he met with another prisoner, Keith Randolph, who advised him how to file a Notice of Claim[7] relating to the false statements of the officers who had claimed Avery made admissions to the murder of Ms. Griffin; in November, 1998, that claim was filed. T/S 119, 126. In the Notice of Claim, Avery asserted that he did not kill Ms. Griffin, that the detectives had questioned him using hypotheticals, but that he had told them the hypotheticals were not true. Ex.6; T/S 118-20, 219. Avery was imprisoned for a time in Oklahoma, together with inmates Antron Kent and Jeffrey Kimbrough. T/S 124-25, 256.

**e. Avery is Prosecuted and Convicted for the Murder of Maryetta Griffin**

Avery served his time on the drug charges and was released in June, 2004. T/S 121. In September of that year, however, he was arrested and charged with the homicide of Ms. Griffin. T/S 122. At his trial, prosecutors introduced testimony from Phillips and Hernandez that Avery had made admissions to them that he killed Ms. Griffin; introduced as physical evidence the police reports of Phillips and Hernandez (Ex.11C, 11D), which purported to record those admissions; and introduced testimony and statements from jailhouse informants Randolph,[8] Kent

---

[7]Under Wisconsin's municipal notice of claim statute, Wis. Stat. § 893.80, a claimant must, as a condition precedent to suit, follow certain procedural requirements before commencing a lawsuit asserting state law claims against a municipality or a municipal employee.

[8]In his testimony Randolph would not repeat his prior statement that Avery had confessed to him, so the prosecutor read into evidence his prior statement and had Randolph agree that he had made it. Ex.24, Ex.1049; T/S 444. In this statement Randolph claimed that Avery had confessed the murder to him. Dkt. 96-1, Exhibit A at 2454-55.

and Kimbrough that Avery had made statements admitting to the murder of Ms. Griffin. T/S 124-25, 256, 1222-24. Kent was testifying against Avery because he wanted to get his sentence reduced, and he had told Defendants Armbruster and Heier this. T/S 586, 883, 1141, 1144. These Defendants failed to record this in their police reports (Ex.1017), and at Avery's criminal trial Kent falsely claimed, without impeachment, that he was not expecting any benefit and was testifying because "I'm trying to change my life." T/S 1162. Avery was found guilty of the homicide of Ms. Griffin, primarily on the basis of the inculpatory statement that Defendants Phillips and Hernandez claimed that Avery made to them. T/S 529. He was sentenced to 40 years in prison. T/S 128.

**f. Serial Killer Walter Ellis**

In 2009, the Wisconsin State Crime Laboratory informed the Milwaukee Police Department that there were nine homicides where the DNA profiles obtained from evidence in the case "hit" to one another, i.e. that the same person's DNA was found in the evidence in all nine cases. T/S 48. The nine cases had many similarities: the victims were females involved in prostitution, drug addicts, lived on the streets, were mostly strangled, and the bodies were left in derelict areas, primarily on the north side of Milwaukee. T/S 48-66, 454-56, 563-66. Walter Ellis was developed as a suspect in these murders, and his DNA was obtained by going to the home where he was living with his girlfriend and obtaining his toothbrush. T/S 568. From the toothbrush a DNA profile was obtained, and it matched the profile in the nine cases. T/S 49-66, 569. Ellis was charged with seven of the homicides. T/S 456, 563-64. In the other two cases linked to Ellis at that time, two different people had been previously charged with the crime. In

one case, Chaunte Ott was charged and convicted of the murder of Jessica Payne. T/S 458.[9] In another case, the murder of Carron Kilpatrick, Curtis McCoy was tried and acquitted of the murder. T/S 50, 458, 565. Ellis was convicted of all seven homicides with which he was charged. T/S 306, 564; Ex.2. He subsequently died in prison of natural causes. T/S 1091.

**g. The Case Against Avery Falls Apart**

Avery became aware of the criminal proceedings against Ellis and noted the similarities to the Maryetta Griffin murder of which he had been wrongly convicted: a drug abuser female prostitute who was strangled and sexually assaulted and whose body was left in a derelict structure on the north side of Milwaukee. T/S 131-33. Indeed, the evidentiary material in the Griffin case, the actual physical evidence, was identical to the type of physical evidence in the seven cases in which Ellis was convicted. T/S 500. In April, 2010, Avery wrote a letter to the Milwaukee County District Attorney, John Chisholm, asserting that he was innocent of the Griffin murder and asking that the semen found in the mouth of Griffin and other evidence in the case be checked against Ellis' DNA. Ex.7; T/S 133. Shortly thereafter, Avery received a reply advising that the prosecutor's office would test the evidence (Ex.8; T/S 134), and shortly after that received another letter, co-signed by two prosecutors, one of them the prosecutor who had prosecuted Avery at his 2004 trial, stating that "a DNA profile was developed from relevant evidence that did not match you or other standards originally collected during the investigation of the case. The profile is consistent with another person who is charged with crimes." Ex.9; T/S

[9]After the Ellis connection to the Payne murder was revealed Ott's conviction was vacated. He subsequently settled his wrongful conviction civil rights claim for $6.5 million. *See* http://www.jsonline.com/news/crime/milwaukee-to-pay-65-million-to-man-cleared-after-13-years-in-prison-b99472841z1-298216201.html. (Last accessed December 14, 2015).

135-36. That person was Walter Ellis. T/S 67-74, 136, 496. As a result of the DNA evidence, the case against Mr. Avery fell apart. T/S 495. The prosecutor's office obtained an attorney for Mr. Avery, his conviction was overturned, and he was released from prison. T/S 136-37.

**h. Two of the Three Jailhouse Informants Recant, the Third Pleads the Fifth**

After Mr. Avery was exonerated, investigators attempted to interview the three jailhouse informants who had testified against Mr. Avery at the homicide trial.

**1. Kimbrough**

In November, 2010, Jeffrey Kimbrough signed an affidavit in which he stated that "the conversation that I testified about at [Avery's] trial never happened . . . I didn't know who William Avery really was until I walked up to the witness stand at trial. I knew his name from my roommate Antron Kent. . . . Antron had spoken with me about backing up his story. . . . Antron told me that he was doing this to get his sentence reduced.. . . . I never heard Mr. Avery confess to killing this woman." Dkt. 76-1, Exhibit V. Kimbrough also stated that he met with Milwaukee police officers, including Heier, a woman, and a Hispanic man, on several occasions and during these sessions "the police officers pressured me into giving the false statement against Mr. Avery. They were coaching me into saying this story. The police had their minds made up to get Avery. The officers were telling me a bunch of stuff about Avery and this case before I gave in and gave the false statement. . . . During the day that I eventually testified I told Officer Heir [sic] that I did not want to testify any longer against Mr. Avery. Officer Heir [sic] told me that I had to do it, that there was no going back. . . .  I tried backing out of it but Officer Heir [sic] told me I had to testify to my story, and that there was no going back on it." *Id.*

**2. Randolph**

In February, 2011, Keith Randolph also signed an affidavit recanting his prior statements implicating Avery. Dkt. 76-1, Exhibit S. In the affidavit Randolph stated that "Avery has never confessed to doing any type of murder. Avery never told me he choked this woman to death. The statement that I gave to the police in 2001 was induced through promises by the Milwaukee Police Department. The police officers led me throughout our conversation. They fed facts to me that ended up in the statement I gave. . . . The officers I met with promised me they were going to get me the best deal they could . . . They did fulfil the second promise by testifying for me at the sentencing hearing in exchange for my false statement." *Id.* Randolph also stated that "prior to trial . . . I informed the officers that I was no longer willing to lie against Avery." *Id.* ¶ 12.

**3. Kent**

Antron Kent was deposed in this case, and when asked whether he had testified falsely at Avery's trial refused to answer, pleading his Fifth Amendment right not to incriminate himself. Dkt. 76-1, Exhibit T. He also took the Fifth when asked whether Milwaukee police officers had coached, threatened or pressured him into making false statements implicating Avery. After Kent's testimony at Avery's trial, Defendant Heier testified at a resentencing hearing for Kent, and Kent's sentence was subsequently reduced by five years. Dkt. 76-1, Exhibit Q.

The Defendants failed to inform the prosecution of the actual facts and circumstances regarding their manipulation and fabrication of the statements of Randolph, Kent and Kimbrough, or that Randolph had admitted , before Avery's criminal trial, that his story was a lie. Dkt. 76-1, Exhibit AA.

**i. The Jailhouse Informants Persist with Their Recantations at the Civil Trial**

At the trial in this case, the jailhouse informants testified in accordance with their recantations. Kimbrough and Randolph testified live, while Kent indicated that he would continue to take the Fifth, so his deposition testimony was read to the jury. T/S 314; Ex.1050. Kimbrough testified that his testimony at Avery's trial that he overheard Avery tell Kent that he choked and killed a woman and got one of his guys to help him get rid of the body was false. T/S 376. He further testified that immediately before he testified Defendant Heier "had me in a holding cell, and I talked to him. I told him that I don't want to continue with the statement, because it wasn't true. And he made me, you know, come in there and finish. . . . He told me that I had to go in there. And I told him, I said I don't want to do it. So I -- you know, I went along with it. Came in there and said those things." T/S 382. Randolph also testified that Avery never told him that he murdered or strangled Griffin, and that the officers were feeding him information and that it was "kind of like a script was being put together." T/S 408-410. After Kimbrough's testimony Plaintiff made a motion that the court reinstate his *Brady* claims, since it was clear that Heier had not revealed to the prosecutor that Kimbrough had told him that his statement was not true. Dkt. 133. As noted above, the district court denied the motion.

**j. The Policy and Practice of the Milwaukee Police Department**

At trial, Plaintiff introduced evidence from Dennis Waller, a police practices expert with extensive experience in law enforcement,[10] regarding deficiencies in the policies and practices of the Milwaukee Police Department as they related to homicide investigations and the handling of

[10]There was no challenge to the admissibility of Waller's testimony based on his credentials.

jailhouse informants. Waller testified that the practices of the MPD showed that investigators failed to keep an open mind in investigations, made decisions that a crime occurred in a certain way and then would only consider things that supported their initial opinion, failed to properly investigate and explore connections between the several murders of prostitutes and drug users that occurred in the precise vicinity where Ms. Griffin's body was found, and that standards for conducting homicide investigations were being ignored in favor of simply clearing cases. T/S 648-51, 659-60, 686, 702. With respect to the jailhouse informants, Waller testified that the Department's policies were deficient in failing to adequately investigate the reliability of the jailhouse informants, and failing to determine whether the information that the informant claimed to possess through personal knowledge was obtained in some other way, and that if they had done such an investigation in this case they would have determined that Kent, Kimbrough and Randolph could have obtained information about the Griffin murder from newspaper articles and the discovery materials that Avery had in his cell. T/S 654-55.

**k. Jury instructions**

The jury was instructed that for Plaintiff to recover against a Defendant on his fabrication of evidence claim he had to prove by a preponderance of evidence that the Defendant knowingly fabricated or participated in the fabrication of material false evidence used to convict the Plaintiff at trial, that the evidence against the Plaintiff was false (i.e. created or made up), and that the Plaintiff was damaged as a result of the fabrication. Dkt. 136 at 13. Defendants did not object to this instruction, other than asserting that it should refer to fabrication of "testimony" rather than "evidence," (T/S 1274), and that it was unnecessary to define "fabricate." T/S 1285. The jury was further instructed that "material" evidence was fabricated evidence that "would have had a

reasonable likelihood of affecting the outcome of the case." *Id.* The jury was also instructed, without objection, on causes of action for failure to intervene and conspiracy[11] (Dkt. 136 at 16-19), and on the policy and practice claim against the City. *Id.* at 21-22.

**l. Verdict**

The jury returned a verdict in favor of Plaintiff and against Defendants Phillips and Hernandez on the fabrication of evidence, failure to intervene and conspiracy counts, and against the City on the policy and practice count. Dkt. 137. The jury decided in favor of the Defendants on all other counts. Subsequently, the court granted the Defendants' motion to amend the verdict and entered judgment in their favor, as set forth in the procedural history above.

## SUMMARY OF THE ARGUMENT

This court has now held on multiple occasions that a police officer violates due process if he fabricates evidence which is then used to deprive a person of liberty, and this is precisely what the jury found occurred here. It was therefore error for the district court to reverse its earlier decision at summary judgment and enter judgment in favor of the Defendants when the jury had found that Defendants Phillips and Hernandez had fabricated material evidence and this fabrication was a proximate cause of the Plaintiff's conviction and sentence.

Additionally, it was error for the court to reverse its decision at summary judgment and hold that the Plaintiff was in fact bringing a malicious prosecution claim rather than a due

---

[11]The Defendants argued that there was insufficient evidence of conspiracy, but did not assert that the substance of the instruction was incorrect. T/S 1275, 1288. The Defendants also stated that they were moving to dismiss the conspiracy claim at the close of all the evidence, but no such substantive motion was ever made, with the only mention of such a motion appearing at T/S 1299: "We're making a motion to dismiss the punitive damages claim, and the conspiracy claim, and the Monell claim."

process claim, and that the existence of a malicious prosecution claim under Wisconsin law precluded the possibility of a due process claim, when the Plaintiff never asserted a federal malicious prosecution claim.

It was additional error, and contrary to this court's holdings, for the district court to rule that the fabrication of evidence that occurred in 1998 was immunized by the fact that the Defendant officers who fabricated the evidence subsequently testified about the fabricated evidence in 2004. Moreover, Plaintiff was injured independently of the officers' testimony, both because the fabrication itself was a cause of his injury and also because the police reports containing the fabricated statement, as to which there was no immunity, were entered into evidence as physical exhibits in Avery's homicide trial.

For all of the above reasons, the fabrication of evidence due process judgments against Defendants Phillips and Hernandez should be reinstated. Because these judgments should be reinstated, the policy and practice judgment against the City of Milwaukee, as to which there was no independent challenge, should also be reinstated.

In addition, the Defendants waived their arguments that the fabrication of evidence did not violate due process by failing to sufficiently articulate those arguments in their Rule 50(a) and post-trial motions.

In addition to reinstatement of the verdicts and judgments against Phillips, Hernandez and Milwaukee, this court should reverse the decisions of the district court entering summary judgment against Plaintiff on his *Brady* claims, and failing to reconsider that ruling after additional evidence of *Brady* violations was adduced at trial, and remand for a new trial on those claims.

## STANDARDS OF REVIEW

**a. Rule 50(b)**

The order granting judgment in favor of Defendants Phillips, Hernandez and Milwaukee was in reality the grant of a motion for judgment as a matter of law under Rule 50(b). *See Cosgrove v. Bartolotta*, 150 F.3d 729, 732 (7th Cir. 1998) (captions of motions "do not control"). Review of a motion for judgment as a matter of law is *de novo*. *Massey v. Blue Cross-Blue Shield of Ill.*, 226 F.3d 922, 924 (7th Cir. 2000); *Zelinski v. Columbia 300, Inc.*, 335 F.3d 633, 639 (7th Cir. 2003). Determination of whether a party waived an issue asserted in a Rule 50(b) motion by failing to argue it in a Rule 50(a) motion is also reviewed *de novo*. *Id.*

**b. Rule 59(e)**

If the Defendants' motion is considered as a motion under Rule 59(e) the rule "requires that the moving party clearly establish a manifest error of law or an intervening change in the controlling law or present newly discovered evidence." *Cosgrove v. Bartolotta*, 150 F.3d at 732; *Romo v. Gulf Stream Coach, Inc.*, 250 F.3d 1119, 1121 (7th Cir. 2001). "A manifest error is not demonstrated by the disappointment of the losing party. It is the wholesale disregard, misapplication, or failure to recognize controlling precedent." *Oto v. Metropolitan Life Ins. Co.*, 224 F.3d 601, 606 (7th Cir. 2000). Relief under Rule 59(e) is an "extraordinary remed[y] reserved for the exceptional case." *Foster v. DeLuca*, 545 F.3d 582, 584 (7th Cir. 2008). Such a motion is appropriate only when the court "has patently misunderstood a party, or has made a decision outside the adversarial issues presented to the Court by the parties, or has made an error not of reasoning but of apprehension." *Bank of Waunakee v. Rochester Cheese Sales, Inc.*, 906 F.2d 1185, 1191 (7th Cir. 1990) (citation omitted). True manifest errors, in which "the Court has

patently misunderstood a party, or has made a decision outside the adversarial issues presented to the Court by the parties, or has made an error not of reasoning but of apprehension," are "rare[ ] . . . and the [Rule 59(e)] motion to reconsider should be equally rare." *Bank of Waunakee v. Rochester Cheese Sales, Inc.*, 906 F.2d 1185, 1191 (7th Cir. 1990). The district court's Rule 59(e) decision is reviewed under an abuse of discretion standard, but the determination of issues of law is *de novo*. *Harrell v. Cook*, 169 F.3d 428, 431 (7th Cir. 1999); *Triad Assocs. v. Robinson*, 10 F.3d 492, 495 (7th Cir. 1993).

**c. Summary Judgment**

This court "review[s] a grant of summary judgment *de novo*, 'reviewing the record and the inferences drawn from it in the light most favorable to the nonmoving party.' *Grayson v. City of Chicago*, 317 F.3d 745, 749 (7th Cir. 2003). Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.' Fed. R. Civ. P. 56(a)." *Burks v. Union Pac. R.R. Co.*, 793 F.3d 694, 700 (7th Cir. 2015).

**d. Conforming Pleadings to the Evidence**

The district court's denial of Plaintiff's motion to reconsider its dismissal of his *Brady* claims in light of the evidence adduced at trial and his motion to conform the pleadings to the evidence (Dkt. 133, T/S 1297), is reviewed under an abuse of discretion standard. *Sunstream Jet Express v. International Air Serv. Co.*, 734 F.2d 1258, 1271-1272 (7th Cir. 1984); *Cosgrove,* 150 F.3d at 732; *Romo*, 250 F.3d at 1121.

## ARGUMENT

### 1. The Fabrication of Plaintiff's Inculpatory Statement Constituted a Viable Due Process Claim for Which Defendant Police Officers Phillips and Hernandez Were Properly Found Liable

#### a. A Police Officer Who Fabricates Evidence That Deprives a Person of Liberty Violates Due Process

This court has now made it abundantly clear, in its holdings, that a police officer who fabricates inculpatory evidence that is subsequently used to deprive a person of liberty is liable to that person for violating his due process rights. *Saunders-El v. Rohde*, 778 F.3d 556, 559 (7th Cir. 2015) ("On the merits, Saunders-El maintains that allegations of evidence fabrication can support a due process claim under § 1983. We agree with him."). In *Saunders-El* the defendants were police officers, and the determination of whether the plaintiff had pled a viable cause of action under the due process clause was directly at issue, and decided, in the case. *Id.* This court addressed the district court's reliance on "our prior decisions in *Fox v. Hayes*, 600 F.3d 819 (7th Cir. 2010); *Brooks v. City of Chicago*, 564 F.3d 830 (7th Cir. 2009); and *Newsome v. McCabe*, 256 F.3d 747 (7th Cir. 2001)—interpreting them as an edict from this court that evidence fabrication-based due process claims can never form the basis of a constitutional tort," and rejected that interpretation, holding, "That reading, not uncommon among district courts in this circuit it seems, is inaccurate and requires clarification." *Saunders-El v. Rohde*, 778 F.3d at 560. The court then provided that clarification.

The court held that "None of these decisions—individually or as a collection—stands for the proposition that fabricating evidence does not violate a defendant's due process, actionable pursuant to § 1983. Instead, they merely establish that allegations that sound in malicious

prosecution must be brought pursuant to state law." *Id.* The court noted that any uncertainty in this area should already have been removed by "our more recent decisions [which] have been explicit." *Id.* The court cited "*Whitlock v. Brueggemann*, 682 F.3d 567, 580 (7th Cir. 2012), [where] we expressly stated that 'a police officer who manufactures false evidence against a criminal defendant violates due process if that evidence is later used to deprive the defendant of [his] liberty in some way,'" *Saunders-El*, 778 F.3d at 560, and noted that:

> For instance, . . . we decided *Fields v. Wharrie*, 740 F.3d 1107 (7th Cir. 2014) ("*Fields II*"), wherein we made clear that fabricating evidence, including witness testimony, violates a clearly established constitutional right, such that qualified immunity does not shield the manufacturers of such evidence from liability. *Id.* at 1114; *see also Petty v. City of Chicago*, 754 F.3d 416, 422 (7th Cir. 2014) ("In *Fields II*, we stated that a prosecutor who falsely creates evidence against a defendant violates the defendant's due process right.").

*Saunders-El*, 778 F.3d at 560.

The only arguable uncertainty as to the viability of a fabrication-based due process claim against a police officer where the fabrication results in a deprivation of liberty has arisen from the dissenting opinion of Judge Sykes in *Fields II*, and dicta (authored by Judge Sykes) that appeared in the court's opinion in *Stinson v. Gauger*, 799 F.3d 833 (7th Cir. 2015), an opinion that has now been vacated. *See* Case Nos. 13-3343, 13-3346, 13-3347, Dkt. 71. Neither of these opinions undermines the viability of a fabrication of evidence due process claim against a police officer.

In *Fields II* the majority opinion dealt with several important issues in this area, including the viability of a fabrication of evidence due process claim, causation, and immunity. Causation and immunity are addressed in other portions of this brief, but as to the viability of the claim for fabrication of evidence, the court was clear that not only was such fabrication a violation of due process, but also that "it was established law by 1985 (indeed long before) . . . that a government

lawyer's fabricating evidence against a criminal defendant was a violation of due process. *See Napue v. Illinois*, 360 U.S. 264, 269 (1959); *Pyle v. Kansas*, 317 U.S. 213, 215-16 (1942); *Mooney v. Holohan*, 294 U.S. 103, 110, 112-13 (1935) (per curiam)." *Fields II*, 740 F.3d at 1114. The court also addressed its earlier opinion in *Buckley v. Fitzsimmons*, 20 F.3d 789 (7th Cir. 1994), and whether that opinion was inconsistent with the later decision in *Whitlock v. Brueggemann*, 682 F.3d 567, and held that it was not, because "the misconduct . . . in *Whitlock* consisted not in coercing witnesses, as in *Buckley*, but in fabricating evidence." *Fields II*, 740 F.3d at 1112. The court also noted that the defendant in *Fields*, in arguing against the existence of a cause of action for fabrication of evidence, "is asking us to bless a breathtaking injustice. Prosecutor, acting pre-prosecution as an investigator, fabricates evidence and introduces the fabricated evidence at trial. The innocent victim of the fabrication is prosecuted and convicted and sent to prison for 17 years." *Id.* at 1113.

The dissent in *Fields II* invited the defendants to request rehearing en banc. *Fields II*, 740 F.3d at 1120. The defendants did so, but the petition was denied with Judge Sykes the only judge to vote for rehearing. *See Fields v. City of Chicago*, Case No. 13-1195, Dkt. 41.

The source of the district court's statement here that this court had given "mixed signals" about the viability of a due process fabrication of evidence claim against a police officer was dicta in the now-vacated opinion in *Stinson v. Gauger*, 799 F.3d 833. There, the court suggested, in an opinion authored by Judge Sykes, that "It's not entirely clear that the same reasoning [of *Fields II* and *Whitlock*] applies to police officers and expert witnesses who are alleged to have fabricated evidence during an investigation," *id.* at 842, before stating "We don't need to resolve this question, however." *Id.* In fact, by the time of the *Stinson* decision this court had already

decided precisely this issue as to police officers, in a case where this determination was necessary to the decision, *Saunders-El v. Rohde*, 778 F.3d 556, a binding decision that is not even mentioned in *Stinson*.

Numerous other decisions in this circuit have recognized a due process claim against a police officer for fabrication of evidence. *See, e.g., Newsome v. McCabe*, 319 F.3d 301, 303 (7th Cir. 2003) (affirming a $15 million verdict against police officers on a due process claim where a part of the claim was that the officers had coached an eye-witness during an identification procedure but the coaching was known to the plaintiff at the time of the criminal trial (and thus there was no *Brady* violation for that conduct)); *Jones v. Chicago*, 856 F.2d 985 (7th Cir. 1988) (affirming jury verdict against officers in a due process case "where the police had fabricated some evidence and concealed much exculpatory information"); *Dominguez v. Hendley*, 545 F.3d 585, 589 (7th Cir. 2008) ("withholding material exculpatory evidence from the defense and prosecutor, orchestrating a show-up identification procedure that caused the criminal trial to be unfair, and fabricating evidence against Dominguez. There was and is no disputing that such conduct violates clearly established constitutional rights."); *Armstrong v. Daily*, 786 F.3d 529, 551 (7th Cir. 2015) (recognizing that fabrication of evidence constitutes a due process violation); *Petty v. City of Chicago*, 754 F.3d 416, 422 n.3 (7th Cir. 2014) ("Although *Buckley* and *Whitlock* examined the use of coerced and fabricated evidence as it relates to prosecutorial immunity, the same due process constitutional analysis that applies to prosecutors applies to police officers during the early stages of an investigation because the police and prosecutors are essentially performing the same investigatory function.").

In recognizing a cause of action under the due process clause for fabrication of evidence this circuit is in accord with every other circuit that has considered the issue. *See Limone v. Condon*, 372 F.3d 39, 45 (1st Cir. 2004) (fabricating evidence and framing individuals "necessarily violate due process"); *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 130 (2d Cir. 1997) ("Like a prosecutor's knowing use of false evidence to obtain a tainted conviction, a police officer's fabrication and forwarding to prosecutors of known false evidence works an unacceptable . . .[violation of due process.]"); *Halsey v. Pfeiffer*, 750 F.3d 273, 294 (3d Cir. 2014) ("[I]f a defendant has been convicted at a trial at which the prosecution has used fabricated evidence, the defendant has a stand-alone claim under section 1983 based on the Fourteenth Amendment if there is a reasonable likelihood that, without the use of that evidence, the defendant would not have been convicted."); *Washington v. Wilmore*, 407 F.3d 274, 283 (4th Cir. 2005) (holding that a conviction and incarceration resulting from fabricated evidence may violate due process); *Cole v. Carson*, 802 F.3d 752 (5th Cir. 2015); *Castellano v. Fragozo*, 352 F.3d 939, 942 (5th Cir. 2003) ("manufacturing of evidence and knowing use of that evidence along with perjured testimony to obtain a wrongful conviction deprives a defendant of his long recognized right to a fair trial secured by the Due Process Clause"); *Brown v. Miller*, 519 F.3d 231, 237 (5th Cir. 2008) ("We therefore hold that the deliberate or knowing creation of a misleading and scientifically inaccurate serology report amounts to a violation of a defendant's due process rights, and that a reasonable laboratory technician in 1984 would have understood that those actions violated those rights."); *United States v. Lochmondy*, 890 F.2d 817, 822 (6th Cir. 1989) ("The knowing use of false or perjured testimony constitutes a denial of due process if there is any reasonable likelihood that the false testimony could have affected the judgment of the

jury."); *Wilson v. Lawrence Cnty.*, 260 F.3d 946, 954 (8th Cir. 2001) ("If officers use false evidence, including false testimony, to secure a conviction, the defendant's due process is violated."); *Devereaux v. Abbey*, 263 F.3d 1070, 1074-75 (9th Cir. 2001) (en banc) ("[T]here is a clearly established constitutional due process right not to be subjected to criminal charges on the basis of false evidence that was deliberately fabricated by the government."); *Pierce v. Gilchrist*, 359 F.3d 1279 (10th Cir. 2004); *see also Whitlock*, 682 F.3d at 585-586 ("Significantly, all courts that have directly confronted the question before us agree that the deliberate manufacture of false evidence contravenes the Due Process Clause.").

**b. Avery Established a Violation of His Due Process Rights by Defendants Phillips and Hernandez That Caused His Imprisonment**

Here, there was a direct conflict in the evidence, resolved by the jury's verdict in favor of the Plaintiff, as to whether Defendants Phillips and Hernandez had fabricated the inculpatory statement from Avery in which they claim he acknowledged killing Ms. Griffin and disposing of her body. Avery testified that he never made such a statement, and that although these Defendants posed hypotheticals to him in which he was responsible for the murder, he never agreed that these hypotheticals were an accurate account of what had occurred. Avery testified at trial that he had nothing to do with the murder of Ms. Griffin and that he had last seen her when she was alive, and that she left the 2474 Palmer address at 5:30-6 p.m. on the evening before her body was found. Avery's account was supported by the complete absence of any physical evidence tying him to the slaying and the significant evidence implicating serial killer Walter Ellis, including the fact that Ellis lived directly across the alley from where Ms. Griffin's body was found and that his semen was found in her mouth. T/S 67, 89, 1066, 1243. Defendants

Phillips and Hernandez, on the other hand, claimed that Avery had indeed made statements to them that he was in a fight with Ms. Griffin and was responsible for her murder, statements that were highly inculpatory and were a crucial part of the prosecution of Avery for murder.

The jury was properly instructed, without significant objection, that in order for Avery to prevail on his fabrication claim he had to prove that the Defendants knowingly fabricated or participated in the fabrication of material false evidence used to convict the Plaintiff at trial, that the evidence against the Plaintiff was false (i.e. created or made up), and that the Plaintiff was damaged as a result of the fabrication. The jury then returned a verdict against Defendants Phillips and Hernandez, finding them liable for the due process violation as well as a conspiracy to violate Avery's due process rights and failure to intervene.

Defendants have not challenged the sufficiency of the evidence to establish the due process violations found by the jury, and they clearly have no grounds to do so. They did file a motion pursuant to 59(e) arguing that the proof was insufficient to provide a basis for the jury to find that the fabricated evidence was a proximate cause of his conviction and imprisonment, but this contention was properly rejected by the district court. Dkt. 155 at 12-15. Plaintiff's fabrication claim against Defendants Hernandez and Phillips was based on the March 24, 1998 police reports authored by Hernandez and Phillips, which included statements in which he acknowledged responsibility for the murder of Ms. Griffin. *See* appendix at 40-42. At trial, Defendants Hernandez and Phillips acknowledged that these statements were highly inculpatory, and the record is clear that their fabricated report was used to convict Plaintiff at his criminal trial—the report itself was introduced into evidence at Plaintiff's criminal trial, both Hernandez and Phillips testified as to the contents of the report at the criminal trial and acknowledged that

Plaintiff was convicted primarily based on the report, and it was a crucial piece of evidence because it was the only report in which Plaintiff purportedly admitted to killing Maryetta Griffin. *See* Ex.28, 29.

Defendants argued before the district court that it was the statements from the jailhouse informants that caused Avery's conviction, not the inculpatory statements that Hernandez and Phillips alleged Plaintiff made, but this was clearly a jury issue that was determined adversely to these Defendants. There is no question that "the actions of an official who fabricates evidence that later is used to deprive someone of liberty can be both a but-for and proximate cause of the due process violation." *Whitlock*, 682 F.3d at 583. And it has long been held that causation is a jury question that may not be second-guessed by the court. *See, e.g.*, *Tennant v. Peoria & P. U. R. Co.*, 321 U.S. 29, 35 (1944), where the Court held:

> It is the jury, not the court, which is the fact-finding body. It weighs the contradictory evidence and inferences, judges the credibility of witnesses, receives expert instructions, and draws the ultimate conclusion as to the facts. The very essence of its function is to select from among conflicting inferences and conclusions that which it considers most reasonable. (citations omitted). That conclusion, whether it relates to negligence, causation or any other factual matter, cannot be ignored. Courts are not free to reweigh the evidence and set aside the jury verdict merely because the jury could have drawn different inferences or conclusions or because judges feel that other results are more reasonable.

The *Whitlock* Court noted that "[t]he causal link between a police officer's fabrication and the victim's injury may be broken if that police officer tells a prosecuting attorney before trial about the fabrication." *Whitlock*, 682 F. 3d at 583. But in this case, there was no break in the causal link because Defendants Hernandez and Phillips did not tell the prosecutor about the fabrication. And contrary to Defendants' assertion, the fact that the prosecutor decided initially in 1998 not to issue charges against Plaintiff is beside the point. What matters is that Plaintiff was

eventually charged, stood trial, and was convicted for the Griffin homicide based in part on the inculpatory statements that were fabricated by Hernandez and Phillips. Since the fabricated evidence was used to deprive Plaintiff of his liberty, he was denied a fair trial in violation of his due process rights and there is no break in the causal chain.

Thus, the district court erred in holding that the fabrication of evidence found by the jury could not support a viable due process claim.

### 2. Plaintiff's Due Process Claim Was Not Eliminated by the Possibility of Bringing a Malicious Prosecution Claim under Wisconsin Law

Plaintiff did not attempt to bring a federal malicious prosecution claim, but the district court held that the existence of a potential malicious prosecution claim under Wisconsin state law precluded him from bringing a due process claim based on fabrication of evidence. This decision is directly contrary to the holdings of this court.

In *Saunders-El v. Rohde,* 778 F.3d at 558, this court rejected the principle that a due process claim is precluded by the possibility of a state malicious prosecution claim, holding that the district court's view that fabricating evidence does not violate a defendant's due process rights and cannot support a § 1983 action and that such an allegation must instead be brought as a state law claim for malicious prosecution was "mistaken. A criminal defendant's due process rights may be violated—actionable by way of 42 U.S.C. § 1983—when the evidence against him is fabricated." *Id.* The court later added "the district court erred in holding, categorically, that a claim of evidence fabrication cannot form the basis of a due process claim under § 1983 and must instead be brought as a state law malicious prosecution claim." *Id.* at 559. Moreover, the seminal case on which the district court here relied to support its holding that the due process

claim was pre-empted by the possible state malicious prosecution claim, *Newsome v. McCabe*, 256 F.3d 747 (7th Cir. 2001), allowed a due process claim to proceed, even though there was a state malicious prosecution claim available to the plaintiff. What *Newsome* held was that a plaintiff could not proceed with a **federal** malicious prosecution claim if there was such a state claim available, but it did not bar a federal due process claim. *See Newsome*, 256 F.3d at 751-52 ("Where does this leave Newsome? Certainly not with a constitutional claim founded on malicious prosecution. . . . But he does have a due process claim in the original sense of that phrase--he did not receive a fair trial if the prosecutors withheld material exculpatory details."). Similarly, in the numerous due process fabrication of evidence cases that this court has approved, a state law malicious prosecution claim has been available to the plaintiff, but has not been held to bar the due process claim. *See, e.g., Jones v. Chicago*; *Whitlock v. Brueggemann*; *Dominguez v. Hendley*; *Fields II*; *Armstrong v. Daily*; *Petty v. City of Chicago*.

The Supreme Court has recognized that § 1983 constitutional claims do not replicate causes of action under state law:

> [T]he Court has not suggested that §1983 is simply a federalized amalgamation of pre-existing common-law claims, an all-in-one federal claim encompassing the torts of assault, trespass, false arrest, defamation, malicious prosecution, and more. The new federal claim created by §1983 differs in important ways from those pre-existing torts. It is broader in that it reaches constitutional and statutory violations that do not correspond to any previously known tort.

*Rehberg v. Paulk*, 132 S. Ct. 1497, 1504-1505 (2012). So it is with the cause of action for a violation of due process by fabricating evidence, which does not correspond to any available action under Wisconsin law. The fabrication of evidence claim brought by the Plaintiff required that he establish that the defendants knowingly fabricated or participated in the fabrication of

material false evidence used to deprive him of liberty, that the evidence was false (i.e. created or made up), and that the Plaintiff was damaged as a result of the fabrication.

The elements of a cause of action for malicious prosecution under Wisconsin law are quite different. In such a case the plaintiff would have to establish a prior institution or continuation of some regular judicial proceedings against the plaintiff, by, or at the instance of, the defendant; the former proceedings must have terminated in favor of the plaintiff in this case; malice; want of probable cause for the institution of the former proceedings; and injury or damage to the plaintiff. *Strid v. Converse*, 111 Wis. 2d 418, 423 (1983). The Wisconsin courts have established detailed rules for state malicious prosecution actions, including determining whether the defendant instituted the proceedings against the plaintiff, *see, e.g.*, *Whispering Springs Corp. v. Town of Empire*, 183 Wis. 2d 396, 405 (Wis. Ct. App. 1994); mandating that the underlying action must have been instituted without probable cause, *see, e.g.*, *Wesley v. Nickels*, 167 Wis. 2d 487 (Wis. Ct. App. 1992); *Krieg v. Dayton-Hudson Corp.*, 104 Wis. 2d 455 (Wis. 1981); holding that a conviction, even if reversed on appeal, establishes probable cause and bars the action, *id.* at 461; *Tarantino v. Griebel*, 9 Wis. 2d 37 (1960); requiring that the plaintiff prove that the defendant "acted chiefly from motives of ill will, or . . . his primary purpose was something other than the social one of bringing an offender to justice," *Meyer v. Ewald*, 66 Wis. 2d 168, 175 (1974) (internal quotation marks omitted); holding that willful and wanton disregard for the facts is not in itself sufficient to establish malice, *Yelk v. Seefeldt*, 35 Wis. 2d 271, 278 (1967); and the legislature has capped the amount that can be recovered against a state actor who engaged in malicious prosecution at $50,000, no matter how long the wrongful imprisonment.

Wis. Stat. § 893.80(3). In sum, the tort of malicious prosecution under Wisconsin law "has not been favored by the courts." *Krieg v. Dayton-Hudson Corp.*, 104 Wis.2d 455, 460 (1981).

It is thus readily apparent that the elements of a due process cause of action for fabrication of evidence are quite different from a cause of action for malicious prosecution under Wisconsin law. Moreover, the federal courts have not disfavored a cause of action based on fabrication of evidence. On the contrary, this court has stressed the social benefits of civil lawsuits in providing relief to plaintiffs wrongfully convicted because of evidence fabrication and deterring misconduct by police officers. *See, e.g.*, *Fields II*, 740 F.3d at 1113. Here, the evidence fabrication claim is based on a "constitutional . . . violation[] that do[es] not correspond to any previously known tort," *Rehberg v. Paulk*, 132 S. Ct. at 1505, and thus may be brought regardless of the existence of a cause of action under state law for malicious prosecution.

### 3. The Fabrication of Evidence by Phillips and Hernandez Was Not Immunized by Their Subsequent Testimony at Avery's Criminal Trial

The district court held that Avery could not recover for the harm caused by the fabrication of the inculpatory statement because that fabrication did not harm him until Phillips and Hernandez testified to it in the criminal trial, and that testimony was immunized. Dkt. 155 at 12. The court held that because the fabrication was neither "manufactured physical evidence nor the concoction of a false story fed to a witness by law enforcement," *id.* at 11-12, but rather the fabrication of plaintiff's own inculpatory statement, the holdings in *Whitlock* and *Fields II* did not apply. This holding was both factually inaccurate and contrary to the legal principles of causation applicable to constitutional torts.

First, the court's assertion that the fabrication did not lead to the manufacture of physical evidence is incorrect. In the course of the fabrication, Defendants Phillips and Hernandez created two police reports that purported to record the fabricated statement, Ex.11C and 11D, and those report were then used in various ways to harm Plaintiff, including identifying him as a suspect in the murder of Ms. Griffin, the publication in the newspaper of the story (available to the inmate witnesses) stating that Avery had confessed to the murder, and, most importantly, the exhibits were entered into evidence as physical exhibits at Avery's homicide trial. T/S 250-53, 1222-24.

Additionally, the court's ruling contradicts the causation holdings of *Whitlock*, *Fields II* and *Jones.* The decision in *Whitlock* is clear: conventional rules of causation apply in constitutional tort cases and so long as the fabrication of evidence is not immunized, the fact that it eventually causes harm through an immunized act, such as testimony, does not retroactively immunize the prior misconduct. Thus, the court held:

> Section 1983 imposes liability on every official who "subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983 (emphasis added). This provision must be "read against the background of tort liability." *Monroe v. Pape*, 365 U.S. 167, 187, (1961). Causation is a standard element of tort liability, and includes two requirements: (1) the act must be the "cause-in-fact" of the injury, i.e., "the injury would not have occurred absent the conduct"; and (2) the act must be the "proximate cause," sometimes referred to as the "legal cause," of the injury, i.e., "the injury is of a type that a reasonable person would see as a likely result of his or her conduct." *Ciomber v. Cooperative Plus, Inc.*, 527 F.3d 635, 640 n.1 (7th Cir. 2008) (citing 1 Dan B. Dobbs, The Law of Torts § 182 (2001)).

*Whitlock*, 682 F. 3d at 583. Because of this:

> The actions of an official who fabricates evidence that later is used to deprive someone of liberty can be both a but-for and proximate cause of the due process violation. Without the fabrication, the prosecuting attorney would have had no tainted evidence to introduce at trial. And in a trial where the fabricated evidence

> is the crux of the case (as Whitlock and Steidl allege is the case here), a plaintiff could show that the fabrication was a but-for cause of his conviction.

*Id.* The court noted that there are often multiple proximate causes of an injury and that "it does not matter that other acts are also proximate causes of the ultimate violation, or that some of those acts may be taken by an actor who is absolutely immune." *Id.*

*Whitlock* recognized that its causation holding was not novel and that:

> [w]e have found fabrication to be a proximate cause of the violation in comparable cases. This is why we hold police officers who fabricate evidence liable for the liberty deprivation that occurs later when the fabrication is used. *Jones,* 856 F.2d at 994 (calling the police officer's role "instrumental" in causing the violation). In *Jones* we explained that "[i]n constitutional-tort cases as in other cases, 'a man [is] responsible for the natural consequences of his actions.'" 856 F.2d at 993 (quoting *Monroe*, 365 U.S. at 187).

*Whitlock*, 682 F.3d at 583. And this court continued to adhere to its holdings that conventional causation principles apply in § 1983 case in *Fields II*, where the court noted that "the act that causes an injury need not be simultaneous with the injury (indeed it will never be exactly simultaneous) for the actor to be liable," 740 F.3d 1107 at 1111, and that:

> It may seem difficult to understand why a prosecutor who, acting in an investigative role before judicial proceedings against a criminal defendant began, coerced a witness or fabricated testimony, intending that it be used against the defendant and knowing that it would be used against him, should be excused from liability just because the defendant was not harmed until the witness testified and, as a result, the defendant was convicted and sentenced. He who creates the defect is responsible for the injury that the defect foreseeably causes later.

*Id.* at 1111-12. Because of this principle:

> A prosecutor cannot retroactively immunize himself from conduct by perfecting his wrongdoing through introducing the fabricated evidence at trial and arguing that the tort was not completed until a time at which he had acquired absolute immunity. That would create a "license to lawless conduct," which the Supreme Court has said that qualified immunity is not to do. *Harlow v. Fitzgerald*, 457 U.S. 800, 819 (1982).

*Id.* at 1114.

Obviously it makes no difference to the causation principle that the defendants in *Whitlock* and *Fields II* were prosecutors rather than police officers. *See Petty v. City of Chicago*, 754 F.3d at 422 n.3 ("the same due process constitutional analysis that applies to prosecutors applies to police officers "). And indeed, in numerous other fabrication of evidence claims approved by this court the defendants have been police officers who testified. *See, e.g., Jones*, *Dominguez*. While the district court appeared to consider it dispositive that *Whitlock* and *Fields II* involved fabrication of witness statements from third parties, not the plaintiff, there is no rational basis to make this distinction. Fabrication of an inculpatory statement can be a proximate cause of a deprivation of liberty no matter what the identity of the asserted maker of the statement. *See, e.g.*, *Halsey v. Pfeiffer*, 750 F.3d 273, 289 (fabrication of evidence claim upheld where police "allegedly inserted nonpublic facts about the crime (of which Halsey could not have been aware) into a detailed oral confession that Halsey maintains he never made"); *Yarris v. County of Delaware*, 465 F.3d 129, 138-139 (3d Cir. 2006); *Washington v. Wilmore*, 407 F.3d 274 (4th Cir. 2005); *Ricciuti v. New York City Transit Auth.*, 124 F.3d 123, 130.

Because the fabrication of the inculpatory statement from Avery by Defendants Phillips and Hernandez was not immunized, and because it was foreseeable that the fabrication would deprive Avery of his liberty, Defendants Phillips and Hernandez are not entitled to escape liability through absolute testimonial immunity because they subsequently testified about the statement at Avery's criminal trial. Any contrary conclusion would not deter the fabrication of evidence by police officers and would in fact encourage police officers to testify about the evidence they fabricated in order to immunize their misconduct.

## 4. The Court Erred in Granting Summary Judgment to All Defendants on the *Brady* Claim

In addition to his fabrication of evidence claims, Avery also asserted that several of the Defendants violated their *Brady* obligations by failing to disclose the manner in which they had manipulated the jailhouse informants into falsely stating that Avery had admitted to the murder of Ms. Griffin. At summary judgment he presented evidence from Jeffrey Kimbrough that Defendant Heier and two other Milwaukee police officers (identified through other evidence as Defendants Hein and Hernandez) pressured him into stating that he had overheard Avery make inculpatory statements by coaching him and providing him information about the case, and that prior to testifying he told Defendant Heier that he did not want to testify but that Heier told him he had to do so. Dkt. 96-1 Exhibit V. He also presented testimony from Keith Randolph that he was pressured by the officers into giving a statement against Avery, that these officers fed him information and promised to help him with his sentence, and that before he testified at Avery's criminal trial he told the officers that he was no longer willing to lie against Avery. Dkt. 96-1, Exhibit S. None of this information was provided to the prosecutor, and thus was unknown to defense counsel. Dkt. 96-1, Exhibit AA.

The Due Process clause of the Fourteenth Amendment guarantees a criminal defendant a fair trial. *See, e.g., Mooney v. Holohan*, 294 U.S. 103 (1935). In order to ensure that this right is protected *Brady v. Maryland*, 373 U.S. 83 (1963), held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment . . .." *Id.* at 87. The Court subsequently held that "the duty to disclose such evidence is applicable even though there has been no request by the

accused, *United States v. Agurs*, 427 U.S. 97, 107 (1976), and that the duty encompasses impeachment evidence as well as exculpatory evidence, *United States v. Bagley*, 473 U.S. 667, 676 (1985)." *Strickler v. Greene*, 527 U.S. 263, 280 (1999); *see also Napue v. Illinois*, 360 U.S. 264, 269 (1959) (due process violation for the State to use false evidence which goes to the credibility of the witness). The obligation to produce exculpatory or impeaching evidence extends to materials which are "known only to police investigators and not to the prosecutor." *Kyles v. Whitley*, 514 U.S. 419, 438 (1995). Where a police officer prevents the prosecutor from complying with his duty to produce exculpatory or impeaching evidence by failing to disclose such evidence to the prosecutor, then the officer violates his obligations under *Brady* and the due process clause, and is liable to the criminal defendant. *Newsome v. McCabe*, 256 F.3d 747, 752 (7th Cir. 2001).

Information that police officers fed facts to witnesses, promised them benefits, and, most importantly, that these witnesses told the officers that their statements were not true, is the most obvious *Brady* material. *See, e.g.*, *Giglio v. United States*, 405 U.S. 150 (1972) (failure to disclose oral promise of leniency made to a witness violated *Brady*); *Thompson v. City of Chicago*, 722 F.3d 963, 968 (7th Cir. 2013) (evidence that police officers deliberately withheld and conspired to conceal critical impeachment evidence of a pattern or practice of abuse of power by officers constituted *Brady* material); *Manning v. Miller*, 355 F.3d 1028, 1033 (7th Cir. 2004) (complaint that alleged failure to disclose a conspiracy between the agents and witness to commit perjury, inducing a witness to falsely identify plaintiff in a line-up, and inducing the witness to create a false story, set forth *Brady* violations); *United States v. Boyd*, 55 F.3d 239 (7th Cir. 1995) (failure to disclose witness perjury and benefits to witnesses violated due process);

*Newsome*, 256 F.3d at 752 (suppression of manipulation of eyewitness identifications is an actionable due process violation under *Brady*); *Manning v. Dye*, 2003 U.S. Dist. LEXIS 630, at *12 (N.D. Ill. 2003) (evidence which shows that a witness is lying is "a *Brady* claim in its purest form").

The reason given by the district court for dismissing these claims—that Avery knew he had not admitted to the murder to these informants—confuses what it is that constitutes *Brady* material. If the district court's analysis were correct then no innocent defendant would ever have any right to *Brady* material, because all such defendants presumably know that they are innocent and therefore know that the evidence against them is false. The *Brady* material that was not produced in this case is the **mechanism** by which the false statements of the informants were obtained and Randolph's statement to police that his prior statement was a lie. This was the evidence that was unknown to Avery and his attorneys at the time of his criminal trial and which, had it been known, could have been used by him to attack the credibility and reliability of the witnesses' testimony against him. Thus, this is completely different from the situation in *Gauger v. Hendle*, 349 F.3d 354 (7th Cir. 2003), where the asserted *Brady* material was that the officers lied as to their conduct in the presence of the plaintiff, conduct which he obviously knew about. Here, because the *Brady* material was suppressed by the police, the first that Avery knew about the feeding of evidence and the other *Brady* violations was after his conviction had been reversed.

It was therefore error for the district court to grant summary judgment on the *Brady* claims, and those claims should be remanded to the district court for trial.

### 5. The Court Erred in Refusing to Allow the Jury to Determine the *Brady* Claim Based on the Evidence Adduced at Trial

The evidence at trial revealed even more shocking violations of Avery's due process right to be provided with exculpatory evidence at the time of his criminal trial: Heier failed to advise the prosecutor that Kimbrough had told him before he testified that his accounts of Avery admitting to the murder were lies (T/S 124-25, 376, 382); Armbruster and Heier failed to record in their reports that Kent had told them that he was testifying against Avery because he wanted to get relief on his prison sentence rather than, as Kent claimed at the criminal trial, because he was a reformed man (T/S 586, 883, 1141, 1144, 1153, 1163); and Hein failed to record that she had paid money to prosecution witness Patricia McCoy and, if McCoy (a defense witness at this trial) is believed, had allowed McCoy to keep drugs that she bought in controlled drug buys. T/S 760, 764. Based in part on this evidence, Plaintiff requested that the court reconsider its prior dismissal of the *Brady* claims and/or conform the pleadings to the evidence, and allow the jury to determine the *Brady* claims. Dkt. 133. Plaintiff renewed this request at the close of all the evidence. T/S 1297. The court denied both of the motions. Dkt. 134, T/S 1297.

The refusal of the court to allow the jury to determine the *Brady* claims was an abuse of discretion. The evidence of the *Brady* violations was clear; indeed, as to Armbruster he acknowledged the violation but did not consider it improper, noting that it was the practice of the police department not to document that a witness was seeking favors, even though he recognized that this was valuable impeachment evidence. T/S 1153, 1163. There is no question that if the evidence was credited these Defendants concealed material impeachment evidence that went to the heart of the truthfulness and reliability of the inmate informant testimony.

“The Federal Rules of Civil Procedure envision a liberal policy toward amending pleadings (*see Foman v. Davis*, 371 U.S. 178 (1962)), [and] Rule 15(b) provides that leave to amend shall be given freely . . . when amendment will aid in the presentation of the case and when the objecting party has failed to show prejudice resulting from the amendment.” *Kier v. Commercial Union Ins. Cos.*, 808 F.2d 1254, 1258 (7th Cir. 1987). Here, the evidence at trial, if credited by the jury, revealed at least three instances where vital impeachment evidence was withheld from Mr. Avery at his criminal trial, and there was no way that he would have been aware of it independently. Moreover, there was no unfair prejudice to the Defendants. They knew that Plaintiff had consistently alleged that the Defendants concealed exculpatory evidence with respect to their dealings with the inmate informants, and the issue was fully developed factually—indeed the court specifically allowed questioning on this issue. T/S 872-73.

Additionally, pursuant to Fed. R. Civ. P. 54(b), the court may revise an order “at any time before the entry of a judgment adjudicating all the claims and all the parties’ rights and liabilities.” Here, the summary judgment decision was not a final judgment, since it did not adjudicate all the claims. Under Rule 54(b), a court may revise a decision in order “to correct manifest errors of law or fact or to [allow a party to] present newly discovered evidence.” *Rothwell Cotton Co. v. Rosenthal & Co.*, 827 F.2d 246, 251 (7th Cir. 1987). Here, the testimony at trial of Kimbrough, Armbruster, Heier and McCoy, and the admission by Hein that she had paid McCoy money and not recorded it, constituted newly discovered evidence that the district court should have relied on to reverse its determination at summary judgment not to allow the jury to decide the *Brady* claims.

### 6. Defendants Waived Any Argument That the Fabrication of Evidence Claim Did Not Constitute a Viable Due Process Claim by Failing to Move on this Issue in Their Rule 50(a) and Post-trial Motions

At the conclusion of the Plaintiff's case Defendants moved under Rule 50(a) for judgment as a matter of law on a single issue: whether any of the fabricated statements were a proximate cause of Avery's conviction and imprisonment. Dkt. 130, 131. After the jury returned a verdict against Phillips, Hernandez and the City of Milwaukee these Defendants filed a motion, (Dkt. 146, 147), ostensibly under Rule 59(e), which argued that Plaintiff could not bring a coerced confession claim as a procedural due process violation (Dkt. 147 at 4-10); that Avery's fabricated confession was not a proximate cause of his conviction (*id.* at 10-14); and that because no individual defendants were properly found liable the policy claim also must fail. *Id.* at 14-21. Thus, in neither the 50(a) nor the 59(e) motion did the Defendants move for judgment on the grounds that the district court subsequently ruled on: that fabrication of evidence by a police officer is not a due process violation even when that fabrication subsequently causes a deprivation of the Plaintiff's liberty; that a fabrication of evidence claim must be brought as a state malicious prosecution claim if such a claim is available under state law; and that fabrication of evidence is immunized if the fabricator subsequently testifies to the fabricated statement at trial.

Failure of the Defendants to raise these issues in either a Rule 50(a) or post-trial motion (whether nominated as either Rule 50(b) or 59(e)), waived these issues, and it was improper for the district court to determine them *sua sponte*. *See, e.g., McCarty v. Pheasant Run, Inc.*, 826 F.2d 1554, 1555-1556 (7th Cir. 1987) (plaintiff "failed to move for a directed verdict on the issue of the defendant's negligence, and that is a prerequisite to judgment n.o.v. Fed. R. Civ. P.

50(b)"); *Zelinski v. Columbia 300, Inc.*, 335 F.3d 633, 639 (7th Cir. 2003) ("We can make short work of the acquiescence defense because Columbia failed to move for a directed verdict on that issue. As the district court pointed out during its review of Columbia's post-trial motion, that is a prerequisite to judgment as a matter of law."); *Willis v. Lepine*, 687 F.3d 826, 836 (7th Cir. 2012) ("Failure to adequately present an issue to the district court waives the issue on appeal" (citations omitted); *id.* at 840 "because the plaintiffs did not argue that the jury's verdict went against the manifest weight of the evidence in their Rule 59(a) motion, they have waived that argument on appeal.").

Here, the Defendants comprehensively failed to argue that fabrication of evidence by a police officer that caused a deprivation of liberty was not a due process violation. Instead, they argued that a coerced confession claim could not be a due process violation. While this contention may be incorrect where the coercion causes a liberty deprivation, *see Chavez v. Martinez*, 538 U.S. 760, 767 (2003), it is irrelevant in the context of this case since Plaintiff brought a **fabricated**, not coerced, confession case. Plaintiff's testimony was not that he was coerced into giving a false inculpatory statement, but rather that he never made such a statement at all—it was fabricated by Defendants Phillips and Hernandez. The failure of the Defendants to make any arguments with regard to the viability of a fabricated confession claim prejudiced the Plaintiff, since it meant he was unable to point out to the district court the controlling law that allows for such a claim against police officers.

Thus, Defendants waived any argument that the fabrication of evidence claim was not a viable due process claim, that the existence of a state law malicious prosecution claim rendered a

due process claim unavailable, and that the fabrication is immunized if the fabricator subsequently testifies.

**CONCLUSION**

This court should reverse the judgment of the district court entering judgment against Plaintiff William Avery and in favor of Defendants Phillips, Hernandez and the City of Milwaukee and reinstate the jury verdict and judgment finding them liable. In addition, the court should reverse the judgment in favor of the Defendants on the *Brady* violation claims and remand for a trial on those claims. Upon remand, the district court should additionally determine Plaintiff's motion for costs and attorneys' fees.

Dated: December 17, 2015

s/ John L. Stainthorp
John L. Stainthorp
Janine L. Hoft, Ben H. Elson
People's Law Office
1180 N. Milwaukee Ave.
Chicago, IL 60642
773 235 0070

Attorneys for Plaintiff-Appellant

## CERTIFICATION

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 13,952 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

s/ John L. Stainthorp

**APPENDIX**

I certify that all materials required by Circuit Rule 30 (a) and (b) are included in the Appendix.

s/ John L. Stainthorp

## APPENDIX TABLE OF CONTENTS

**Pages**

1-3 Rule 54(b) Order of November 19, 2015 granting judgment in favor of all Defendants and against Plaintiff and finding no just reason for delay. Dkt. 169

4-19 Memorandum Opinion September 29, 2015 granting Defendants' Motion To Alter or Amend the Judgment. Dkt. 155

20-23 Decision and Order June 9, 2015, denying Defendants' Rule 50(a) motion and Plaintiff's Motion to reconsider the dismissal of his *Brady* claims and/or to conform the pleadings to the evidence. Dkt. 134

24 Oral decision of the court denying Plaintiff's motion to instruct the jury as to Plaintiff's *Brady* claims. T/S 1297

25-39 Memorandum Opinion, August 18, 2014, granting in part and denying in part Defendants' Motion for Summary Judgment. Dkt. 82

40 Plaintiff's Exhibit 11C, the handwritten fabricated police report recording Avery's alleged statement.

41-42 Plaintiff's Exhibit 11D the typewritten fabricated police report recording Avery's alleged statement.

# United States District Court

EASTERN DISTRICT OF WISCONSIN

**SECOND AMENDED**
**JUDGMENT IN A CIVIL CASE**

**WILLIAM D. AVERY,**
**WILLIAM DAMEN AVERY, Jr.,**
**SIRENA ALLINE AVERY,**
**CYNTHIA LYNN TYLER**
**JALISA JONIQUE AVERY, and**
**NAFIA NICOLE AVERY,**

Plaintiffs,

V. CASE NUMBER: **11-CV-408**

**CITY OF MILWAUKEE,**
**DETECTIVE GILBERT HERNANDEZ,**
**DETECTIVE DANIEL PHILLIPS, DETECTIVE KATHERINE HEIN, DETECTIVE TIMOTHY HEIER, DETECTIVE KEVIN ARMBRUSTER, DETECTIVE ERIC GULBRANDSON, and DETECTIVE JAMES DEVALKENAERE,**

Defendants.

☐ Jury Verdict. This action came before the Court for a trial by jury. The issues have been tried and the jury has rendered its verdict.

☒ Decision by Court. This action came on for consideration and a decision has Been rendered.

**IT IS ORDERED AND ADJUDGED that there is no just reason to delay the entry of judgment.**

**IT IS FURTHER ORDERED AND ADJUDGED that judgment is entered in favor of defendants Gilbert Hernandez, Daniel Phillips, Katherine Hein, Timothy Heier, Kevin Armbruster, and James DeValkenaere, and against William Avery, on William Avery's claims that Hernandez, Phillips, Hein, Heier, Armbruster, and DeValkenaere fabricated evidence, failed to intervene to prevent the**

**use of fabricated evidence, and conspired to use fabricated evidence that was a cause of William Avery's homicide conviction.**

**IT IS FURTHER ORDERED AND ADJUDGED judgment is entered in favor of the City of Milwaukee and against William Avery on William Avery's claim that the City of Milwaukee had a policy, practice or custom of inadequately investigating homicides at the time in question which led to the fabrication of evidence resulting in William Avery's homicide conviction.**

**The defendants' motion to alter or amend the judgment against Hernandez, Phillips, and the City of Milwaukee is GRANTED.**

**The defendants' motion for summary judgment on William Avery's claim that defendants Hernandez, Phillips, Hein, Heier, Armbruster, Erik Gulbrandson, and DeValkenaere deliberately withheld exculpatory evidence, failed to intervene to prevent the withholding of exculpatory evidence, and conspired to withhold exculpatory evidence is GRANTED.**

**The defendants' motion for summary judgment on William Avery's claim that the City of Milwaukee had a policy, practice or custom of deliberately withholding exculpatory evidence is GRANTED.**

**William Avery's state law claims for malicious prosecution, negligent infliction of emotional distress, and intentional infliction of emotional distress are DISMISSED with prejudice.**

**William Avery's claims against Gulbrandson are DISMISSED with prejudice.**

**The claims of William Damen Avery, Jr., Sirena Alline Avery, Cynthia Lynn Tyler, Jalisa Jonique Avery, and Nafia Nicole Avery are DISMISSED WITHOUT PREJUDICE. In all other respects, this action is DISMISSED WITH PREJUDICE.**

**The motions for attorney's fees are DENIED.**

**November 19, 2015**
Date

**JON W. SANFILIPPO**
Clerk

**s/ L. Zik**
(By) Deputy Clerk

APPROVED:

Hon. Rudolph T. Randa
U.S. District Judge

11/19/15
Date

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF WISCONSIN**

---

**WILLIAM DAMON AVERY,**

Plaintiff,

**-vs-** **Case No. 11-C-408**

**CITY OF MILWAUKEE, et al.,**

Defendants.

---

## DECISION AND ORDER

---

William Damon Avery was convicted, but later exonerated, for the 1998 murder of Maryetta Griffin. In this civil rights suit, a nine-person jury found that Milwaukee police detectives Gilbert Hernandez and Daniel Phillips fabricated Avery's confession. The jury also concluded that Hernandez and Phillips conspired to fabricate and failed to intervene to prevent the use of Avery's confession as evidence to convict him. Finally, the jury found that the City of Milwaukee had a policy, practice, or custom of inadequately investigating homicides which led to Avery's conviction. The jury awarded one million dollars in damages.

Now before the Court is the defendants' motion to alter or amend the Court's judgment on this verdict. Fed. R. Civ. P. 59(e). They argue that Avery is barred from recovering on his due process claim as a matter of

law, that Avery's confession was not a proximate cause of his incarceration, and that the policy or practice claim must fail in the absence of a valid underlying claim against Phillips and Hernandez. The Court agrees with the first and third arguments. As a result, it is not necessary to reach the causation issue, but the Court will address it for the sake of a complete appellate record.

Also before the Court are fee petitions by Avery's attorneys. Since the judgment will be altered in favor of the defendants, Avery is no longer a prevailing party, so these motions must be denied.

For the reasons that follow, the defendants' motion to alter or amend the judgment is granted.

## I. Background

In March of 1998, Avery was interviewed as a person of interest in relation to the Griffin murder. Avery ran a dope house that was frequented by prostitutes like Griffin. Phillips and Hernandez authored a report which stated that Avery told them he sold "dope" to Griffin and that after he had fallen asleep he was awakened by Griffin going through his pockets and pulling out his money; that he fought with Griffin; that he did not remember what happened but he told "Ronnie" that he thought he "killed this bitch;" and that he was responsible for the murder, but he did not

remember how he killed her. Defendant's Exhibit 1030. This evidence, in the view of Milwaukee Assistant District Attorney Mark Williams, was insufficient to bring homicide charges. Avery was found guilty on charges arising out of the activities surrounding his dope house operations and sent to prison.

Three years later in 2001, Keith Randolph, an Avery acquaintance who was serving time in the same prison as Avery, contacted the Milwaukee Police Department through his attorney and said he heard Avery tell him that he was involved in Griffin's homicide. Detective Timothy Heier went to the prison and took the inculpatory statement from Randolph. Once again, District Attorney Williams declined to bring homicide charges against Avery. In the meantime, Avery was transferred from Wisconsin to a prison in Oklahoma. On July 25, 2002, while Avery was in the Oklahoma prison, Milwaukee police detective Kevin Armbruster received an anonymous call from a prisoner in the same Oklahoma prison stating that he had information implicating Avery in the Griffin murder. The anonymous caller turned out to be Antron Kent who said that in conversations with Avery, Avery admitted killing Griffin. Another inmate, Jeffrey Kimbrough, said he heard those admissions. Based on these intersecting admissions by Avery, made to different people at different

times and at different locations, District Attorney Williams brought a homicide charge.

Phillips and Hernandez testified at Avery's criminal trial, in accordance with their 1998 report, that Avery confessed to being responsible for Griffin's murder. Kent, Kimbrough, and Randolph also testified for the prosecution. Avery was convicted of first degree reckless homicide, party to a crime, but because there was no DNA evidence linking Avery to the crime, and because there was DNA evidence from a serial killer named Walter Ellis discovered on the body of Griffin, Avery was released in 2010.

Avery's release resulted in this lawsuit. Avery and his children sued the City of Milwaukee and seven police detectives: Hernandez, Phillips, Heier, Katherine Hein (n/k/a Spano), Armbruster, Eric Gulbrandson, and James DeValkenaere. After lengthy pre-trial litigation, Avery's suit survived summary judgment on his claim that the defendants "violated his clearly established due process rights by creating false written reports that he confessed, knowing that he had not, and also by manufacturing false testimony from jailhouse informants in order to corroborate the fabricated confession." 40 F. Supp. 2d 1089, 1094-95 (E.D. Wis. 2014). The Court granted the defendants' motion for summary judgment on Avery's claim

that the defendants violated due process "by not disclosing the fact that they coached and manipulated the jailhouse informants into falsely implicating him in the Griffin murder." *Id.* at 1096. The latter claim arose under *Brady v. Maryland*, 373 U.S. 83 (1963), a "due process case that entitles criminal defendants to be shown any exculpatory evidence … in the possession of prosecutors, … ." *Id.* (quoting *Gauger v. Hendle*, 349 F.3d 354, 360 (7th Cir. 2003)).

Before trial, the parties stipulated to the dismissal of Avery's state law claims and all of his claims against Detective Gulbrandson. ECF Nos. 126, 127. Also before trial, the Court dismissed the loss of companionship claims brought by Avery's children. ECF No. 116. Thus, Avery's case went to trial on the aforementioned due process claim against Phillips, Hernandez, Hein (Spano), Heier, Armbruster, DeValkenaere, and the City of Milwaukee.

Defendants argue, given the verdict and Avery's testimony, that the jury's finding of fabrication is limited to Avery's confession. The Court agrees with this characterization of the evidence and the verdict. So does Avery. ECF No. 153, at 6 ("Plaintiff's fabrication claim against Defendants Hernandez and Phillips was based on the March 24, 1998 police report authored by Hernandez, …").

## II. Analysis

Motions under Rule 59(e) serve the limited function of allowing a court to correct manifest errors of law or consider newly discovered material evidence. *County of McHenry v. Ins. Co. of the West*, 438 F.3d 813, 819 (7th Cir. 2006). Rule 59(e) is the correct vehicle for the defendants' first and third arguments – that Avery's due process claim fails as a matter of law, and that Avery's *Monell* claim collapses in the absence of a valid underlying claim. Neither argument asks the Court to consider whether the jury had a "legally sufficient *evidentiary basis*" to find for Avery on these issues. Fed. R. Civ. P. 50(a), (b) (Judgment as a Matter of Law in a Jury Trial) (emphasis added). Defendants' causation argument will be considered under Rule 50(b). *See Cosgrove v. Bartolotta*, 150 F.3d 729, 732 (7th Cir. 1998) ("The motion was filed within the time limit for a 50(b) motion (which is the same as that for a 59(e) motion …) and it contained the information required for a 50(b) motion. That was good enough; captions do not control").

### A. Due process

At summary judgment, the Court found that Avery's due process claim was viable pursuant to cases such as *Whitlock v. Brueggemann*, 682 F.3d 567 (7th Cir. 2012) and *Fields v. Wharrie*, 740 F.3d 1107 (7th Cir.

2014) ("*Fields II*"). In *Whitlock*, for example, the Seventh Circuit explained that it has "consistently held that a police officer who manufactures false evidence against a criminal defendant violates due process if that evidence is later used to deprive the defendant of her liberty in some way." 682 F.3d at 580; *see also Fields II*, 740 F.3d at 1114 ("it was established law by 1985 (indeed long before) … that a government lawyer's fabricating evidence against a criminal defendant was a violation of due process"). The Court rejected the argument that Avery's fabrication claim amounts to a claim for malicious prosecution, which is "knock[ed] out" by the "existence of a tort claim under state law." 40 F. Supp. 3d at 1095 (quoting *Newsome v. McCabe*, 256 F.3d 747 (7th Cir. 2001)). "Perhaps it used to, *see, e.g., McCann v. Mangialardi*, 337 F.3d 782, 786 (7th Cir. 2003), but no longer in light of *Whitlock* and *Fields II*." *Id.*

Since that ruling, the Seventh Circuit has issued two decisions discussing *Whitlock* and *Fields II* in relation to cases such as *Newsome* and *McCann*. First, the court explained that the *Newsome-McCann* line of cases does not stand for the proposition that "fabricating evidence does not violate a defendant's due process, actionable pursuant to § 1983. Instead, they merely establish that allegations that sound in malicious prosecution must be brought pursuant to state law. To the extent that these decisions

may have rendered the law in this area uncertain, our more recent decisions have been explicit." *Saunders-El v. Rohde*, 778 F.3d 556, 560 (7th Cir. 2015) (citing and discussing *Whitlock*, *Fields II*, and *Petty v. City of Chi.*, 754 F.3d 416, 422 (7th Cir. 2014)). Thus, the district court erred by "categorically" holding that "a claim of evidence fabrication cannot form the basis of a due process claim under § 1983 and must instead be brought as a state law malicious prosecution claim." *Id.* (emphasis in original).

Second, the court explained that "[r]ecent cases in this circuit hold that a *prosecutor* who fabricates evidence against a suspect and later uses that evidence to convict him violates due process, and this due-process right was clearly established by at least the early 1980s." *Stinson v. Gauger*, --- F.3d ----, 2015 WL 5011961, at *7 (7th Cir. Aug. 25, 2015) (citing *Fields II* and *Whitlock*) (emphasis added). Such a constitutional violation "occurs when the evidence is fabricated, not when the fabricated evidence is later introduced at trial – a crucial distinction because the prosecutor would have absolute immunity for any constitutional violation committed during the trial." *Id.* The court continued:

> *It's not entirely clear that the same reasoning applies to police officers and expert witnesses who are alleged to have fabricated evidence during an investigation.* Unlike prosecutors, police investigators face liability for failing to disclose their own fabrication of evidence. That's because immunity doesn't

> protect an officer who fails to disclose material exculpatory evidence as required by *Brady*, even though a prosecutor who did the same thing would have absolute immunity for the suppression, … .
>
> *Moreover, a line of cases in this circuit has squarely held that a police officer's fabrication of evidence (as distinct from his suppression of material exculpatory evidence) is not actionable as a violation of due process as long as state law provides an adequate remedy for the fabrication – usually in the form of a malicious-prosecution tort action.* Under these cases due process is satisfied as long as the state permits a suit against the culpable officer after the fact. *Whitlock* did not address this line of cases. If they remain good law, then the due-process claim against prosecutors recognized in *Whitlock* and applied in *Fields II might not be available against police officers … unless state law lacks an adequate tort remedy for the fabrication of evidence.*

2015 WL 5011961, at *8 (emphases added) (internal citations omitted).

Accordingly, there are mixed signals coming from the Seventh Circuit regarding the viability of due-process fabrication claims against police officers. *Whitlock* baldly states that "a *police officer* who manufactures false evidence against a criminal defendant violates due process if that evidence is later used to deprive the defendant of her liberty in some way." 682 F.3d at 580 (emphasis added). *Stinson*, however, draws out the distinction between prosecutors and police officers and suggests, but does not hold, that a due process claim cannot be maintained against the latter as opposed to the former. *Stinson*, 2015 WL 5011961, at *8 ("We

don't need to resolve this question, however, because Stinson's claims fail even assuming *Whitlock* and *Fields II* apply to state actors other than prosecutors").

The Court is now persuaded, in the wake of *Stinson* and *Saunders-El*, that Avery's due process claim is governed by *Newsome-McCann*, not *Whitlock-Fields II*. The former line of cases, as *Stinson* makes clear, has not been overruled. What matters then is whether Avery's claim "sounds" in malicious prosecution, *Saunders-El*, 778 F.3d at 560, and whether there is an available remedy under Wisconsin law. It does and there is. *See* Amended Complaint, ¶¶ 54-55 (alleging that the defendants fabricated evidence "thereby misleading and misdirecting the criminal prosecution" which "directly resulted" in an "unjust criminal conviction"); *Strid v. Converse*, 331 N.W. 2d 350, 353-54 (Wis. 1983) (listing elements of claim for malicious prosecution). Therefore, Avery is not entitled to relief on his due process claim. *Saunders-El* at 561; *McCann*, 337 F.3d at 786 (plaintiff's claim that defendant denied him due process by "causing him to suffer '[a] deprivation of liberty from a prosecution and a contrived conviction … deliberately obtained from the use of false evidence,' … is, in essence, one for malicious prosecution, rather than a due process violation"); *Newsome*, 256 F.3d at 750 ("the existence of a tort claim under state law knocks out

any constitutional theory of malicious prosecution"); *Fox v. Hayes*, 600 F.3d 819, 841 (7th Cir. 2010) (claim that the defendants violated due process when they "deliberately fabricated false statements and deliberately obstructed justice, thereby causing the false arrest of [plaintiff], causing him to be falsely imprisoned [and] prosecuted" was "nothing more than a hybrid of [plaintiff's] Fourth Amendment false arrest and state law malicious prosecution claims, and accordingly, the due process claim is barred"); *Brooks v. City of Chi.*, 564 F.3d 830, 833 (7th Cir. 2009) (claim that "criminal proceedings were instituted … based on false evidence or testimony" is "one for malicious prosecution, rather than a due process violation").[1]

Moreover, Avery's claims against Phillips and Hernandez are "factually distinct" from the claims in *Whitlock* and *Fields II*, as was the case in *Munoz v. Rivera*, No. 14 C 6794, 2015 WL 3896917, at *2 (N.D. Ill. June 23, 2015). In *Munoz*, the plaintiff claimed that a police officer and two police detectives fabricated evidence that twice led to jury convictions for the murder of his girlfriend. Unlike in *Whitlock*, *Fields II*, and *Petty*, the plaintiff alleged "neither manufactured physical evidence nor the

[1] Avery brought a state law claim for malicious prosecution, but he stipulated to its dismissal *with prejudice* before trial. That course of action, it would seem, was a mistake.

'concoction' of a false story fed to a witness by law enforcement." 2015 WL 3896917, at *3. Remember, as relevant here, that the jury did *not* find that either Hernandez or Phillips were responsible for fabricating or "feeding a story" to Randolph, Kimbrough, or Kent. In addition, the contents of the alleged "false reports" in *Munoz* were "*the very facts defendants testified to during plaintiff's trials*. Yet, *defendants are absolutely immune from § 1983 damages claims based on their testimony*." *Id.* (emphasis added). The same reasoning applies here because Hernandez and Phillips testified in accordance with their 1998 report: in short, that Avery confessed to killing Maryetta Griffin. Thus, even if Avery's due process claim was actionable, Hernandez and Phillips would be entitled to absolute immunity. *See Briscoe v. LaHue*, 460 U.S. 325 (1983) (police officers, like other witnesses, are entitled to absolute immunity from civil damages suits for testimony provided in judicial proceedings).[2]

**B. Causation**

Under Rule 50(b), a party that filed a Rule 50(a) motion before submission to the jury can renew that motion within 28 days after the

---

[2] Likely recognizing this immunity, Avery is careful to state that the premise for his claim is the police report. Once again, such a claim is a malicious prosecution claim, not a due process claim. *Munoz*, 2015 WL 3896917, at *4 ("to the extent plaintiff claims that defendants' false reports *led to the initiation of his criminal proceedings without probable cause*, his allegations appear to state the elements of Illinois' law of malicious prosecution …") (emphasis added).

entry of judgment on the verdict. Relief may be granted if "a reasonable jury would not have a legally sufficient basis to find for the party on that issue." Fed. R. Civ. P. 50(a). The Court construes the evidence strictly in favor of the prevailing party and examines the evidence only to determine whether the jury's verdict could reasonably be based on that evidence. *Passananti v. Cook County*, 689 F.3d 655, 659 (7th Cir. 2012).

Section 1983 imposes liability on every official who "subjects, *or causes to be subjected*, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983 (emphasis added). This provision is "read against the background of tort liability." *Monroe v. Pape*, 365 U.S. 167, 187 (1961). Causation is a standard element of tort liability, and it includes two requirements: (1) "cause-in-fact," i.e., "the injury would not have occurred absent the conduct;" and (2) "proximate cause," or "legal cause," *i.e.*, "the injury is of a type that a reasonable person would see as a likely result of his or her conduct." *Ciomber v. Cooperative Plus, Inc.*, 527 F.3d 635, 640 n.1 (7th Cir. 2008).

"The actions of an official who fabricates evidence that later is used to deprive someone of liberty can be both a but-for and proximate cause of

the due process violation." *Whitlock* at 583. However, the so-called "causal chain" can be broken by an intervening or superseding cause. "A superseding cause is something culpable that intervenes …, some action of a third party that makes the plaintiff's injury an unforeseeable consequence of the defendant's negligence." *Scottsdale Ins. Co. v. Subscription Plus, Inc.*, 299 F.3d 618, 621 (7th Cir. 2002). At the same time, "there is no rule demanding that every case have only one proximate cause. To the contrary, 'multiple proximate causes are often present' and 'an actor's tortious conduct need not be close in space or time to the plaintiff's harm to be a proximate cause.'" *Whitlock* at 583 (quoting Rest. 3d Torts § 29 cmt. B).

Defendants focus on the fact that Avery wasn't charged until Randolph, Kent, and Kimbrough came forward and implicated Avery in the Griffin murder. Thus, the defendants argue – keeping in mind that the jury did not find that either Hernandez or Phillips were responsible for feeding a fabricated story to Randolph, Kent, or Kimbrough – that the evidence offered by those individuals implicating Avery broke the causal chain between Avery's confession and his conviction. To the contrary, what matters is whether Avery's *conviction* was foreseeable. The jury could have found as such despite the subsequent evidence offered by these witnesses

which independently implicated Avery. If there are competing reasonable inferences to be drawn from the evidence, it is not the Court's role to substitute one reasonable inference for another reasonable inference drawn by the jury. Based on the evidence presented, the jury could and did draw reasonable inferences from that evidence to conclude that Avery's conviction was a foreseeable consequence of fabricating a confession.

### C. *Monell* claim

To determine whether the City of Milwaukee's liability is dependent on its officers, the Court must look to "the nature of the constitutional violation, the theory of municipal liability, and the defenses set forth." *Thomas v. Cook Cnty. Sheriff's Dep't*, 604 F.3d 293, 305 (7th Cir. 2009 (citing *Los Angeles v. Heller*, 475 U.S. 796, 798-99 (1986)). Avery's theory of municipal liability is that the City had a policy or practice to not adequately investigate homicides, and as a result, the defendants fabricated evidence against Avery to convict him. The jury found that five of the defendants did not fabricate evidence, and as to the other two, the Court has now concluded that Avery has no actionable due process claim as a matter of law. The jury was not instructed on any affirmative defenses. Therefore, the judgment must be altered in favor of the City because Avery's constitutional rights were not violated. *Thomas*, 604 F.3d at 304-05

(discussing *Heller*) ("Without any affirmative defenses, a verdict in favor of the officer necessarily meant that the jury did not believe the officer violated the plaintiff's constitutional right. And since the City's liability was based on the officer's actions, it too was entitled to a verdict in its favor"); *Matthews v. City of East St. Louis*, 675 F.3d 703, 709 (7th Cir. 2012) ("Here, there was no constitutional violation, therefore no municipal liability").

***

**NOW, THEREFORE, BASED ON THE FOREGOING, IT IS HEREBY ORDERED THAT** the defendants' motion to alter or amend the judgment [ECF No. 146] is **GRANTED**. The motions for attorney's fees [ECF Nos. 148, 152] are **DENIED**. The Clerk of Court is directed to amend the judgment accordingly.

Dated at Milwaukee, Wisconsin, this 29th day of September, 2015.

**BY THE COURT:**

Rudolph T. Randa

**HON. RUDOLPH T. RANDA**
**U.S. District Judge**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

**WILLIAM DAMON AVERY,**

Plaintiff,

**-vs-** **Case No. 11-C-408**

**CITY OF MILWAUKEE, et al.,**

Defendants.

## DECISION AND ORDER

The defendants move for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(a). Also before the Court is the plaintiff's motion to reconsider the dismissal of his *Brady* claims and/or to conform the pleadings to the evidence. Both motions are denied.

Rule 50(a) provides that the Court may grant a motion for judgment as a matter of law if a party "has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue, …" This standard "mirrors the standard for granting summary judgment. Thus, [the Court] must view the evidence and all reasonable inferences drawn from that evidence in the light most favorable to the party against whom judgment was granted." *Alexander v. Mt. Sinai Hosp. Med. Ctr.*, 484 F.3d 889, 902 (7th Cir. 2007). Avery presented evidence that the defendants fabricated Avery's

statements about the murder of Maryetta Griffin. Avery also presented evidence that the defendants fabricated evidence related to jailhouse informants Antron Kent, Jeffery Kimbrough, and Keith Randolph, which was used to convict Avery at trial. If credited, this evidence could form a legally sufficient basis to find in favor of Avery on his due process claims.

As for the *Brady* claims,[1] the Court explained in its summary judgment ruling that the duty to disclose exculpatory evidence under *Brady* "'drops out' because Avery knew what he said (or didn't say) to the jailhouse informants, …" ECF No. 82, Decision and Order at 13. Avery now argues that the Court should revive his *Brady* claims because Kimbrough testified in the instant civil trial that he told defendant Timothy Heier that he did not want to testify at Avery's criminal trial. Further, Kimbrough testified that he told Heier that his previous statements about overhearing Avery confess to the Griffin murder were false. This "new evidence" goes back to the same concept: if Kimbrough was lying, Avery knew that he was lying. Thus, Avery was perfectly capable of cross-examining Kimbrough in that regard at his criminal trial. *See Harris v. Kuba*, 486 F.3d 1010, 1017 (7th Cir. 2007); *Sornberger v. City of Knoxville*, 434 F.3d 1006, 1029 (7th Cir. 2006). False statements by a

[1] *Brady v. Maryland*, 373 U.S. 83 (1963) is a "due process case that entitled criminal defendants to be shown exculpatory evidence (including evidence usable to impeach a prosecution witness) in the possession of prosecutors, …" *Gauger v. Hendle*, 349 F.3d 354, 360 (7th Cir. 2003).

prosecution witness cannot form the basis of a claim on the theory that "by failing to correct the statement the prosecution deprived the defendant of *Brady* material, that is, the correction itself." *Gauger*, 349 F.3d at 360.

Avery also requests leave to amend his complaint to bring a *Brady* claim based upon Patricia McCoy's testimony in the instant civil trial that defendant Hein/Spano paid her with money and drugs. Fed. R. Civ. P. 15(b) (Amendments During and After Trial.) Under this provision, a district court is "well within its discretion" to deny a motion seeking to add a new theory of liability if the defendant has not consented to it. *Reynolds v. Tangherlini*, 737 F.3d 1093, 1106 (7th Cir. 2013). The Court will exercise that discretion here. The alleged fabrication of evidence is and was the focus of this case, not the credibility of Patricia McCoy. *See Kier v. Comm'l Union Ins. Co.*, 808 F.2d 1254, 1258 (7th Cir. 1987) (affirming denial of leave to amend where claim "was neither an issue previously contemplated by the parties nor properly addressed by the already completed discovery").

**NOW THEREFORE, BASED ON THE FOREGOING, IT IS HEREBY ORDERED THAT**:

1. Defendants' motion for judgment as a matter of law [ECF No. 130] is **DENIED**; and
2. Avery's motion to reconsider the dismissal of his *Brady* claims [ECF No. 133] is **DENIED**.

Dated at Milwaukee, Wisconsin, this 9th day of June, 2015.

**BY THE COURT:**

**HON. RUDOLPH T. RANDA**
**U.S. District Judge**

to you.

MR. STAINTHORP: Judge, there's another issue that we want to raise, which is that we would like to again propose that there be a Brady instruction. I've -- we've, as you know, previously made that motion. You denied it. We believe that since that time there has been additional evidence of Brady violations by the Defendants in this case, and relating to their knowledge that the evidence that was being presented by the jailhouse informants was incorrect. Also related to the fact that there was knowledge that Mr. Kent in particular was looking for benefits with respect to his testimony. And that was not disclosed. And with respect to the payments to Ms. McCoy, which were also not disclosed. So we would again request that there be a Brady instruction to the jury. That they be allowed to determine whether the Plaintiff's rights under Brady were violated.

THE COURT: Okay. The Court is going to deny that. I don't think it rises to that level, considering the testimony of Detective Hein, in particular, and also Detective Armbruster involved in that initial conversation with Kent. But without going into all of the facts that would support it, I'm going to deny that motion. And it's made part of the record.

MR. SMOKOWICZ: Your Honor, I have a couple of things. Housekeeping with respect to Exhibits. With regard to Defendant's Exhibit 1052, that is the Avery deposition

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF WISCONSIN**

---

**WILLIAM DAMON AVERY,**
**WILLIAM DAMEN AVERY, Jr.,**
**SIRENA ALLINE AVERY,**
**CYNTHIA LYNN TYLER, and**
**JALISA JONIQUE AVERY and**
**NAFIA NICOLE AVERY, minors by their**
**Father and next friend William Avery,**

Plaintiffs,

**-vs-** **Case No. 11-C-408**

**CITY OF MILWAUKEE,**
**DETECTIVE GILBERT HERNANDEZ,**
**DETECTIVE DANIEL PHILLIPS,**
**DETECTIVE KATHERINE HEIN,**
**DETECTIVE TIMOTHY HEIER,**
**DETECTIVE KEVIN ARMBRUSTER,**
**DETECTIVE ERIC GULBRANDSON, and**
**DETECTIVE JAMES DEVALKENAERE,**

Defendants.

---

# DECISION AND ORDER

---

William Damon Avery spent six years in prison for a crime he didn't commit: the murder of a drug-addicted prostitute named Maryetta Griffin. Avery was exonerated by DNA testing which excluded Avery and matched the profile of Walter E. Ellis, an accused serial killer.[1]

In this civil rights lawsuit, Avery alleges that certain City of Milwaukee police

[1] *See* http://www.innocenceproject.org/Content/William_D_Avery.php.

detectives withheld exculpatory evidence, fabricated a false confession, and procured false testimony from three jail house informants. This conduct, according to Avery, violated his due process rights under the United States Constitution. Avery also brings claims for conspiracy and failure to intervene, a claim against the City under *Monell v. New York City Dep't of Social Servs.*, 436 U.S. 658 (1978), and a series of supplemental state law claims for malicious prosecution, negligent infliction of emotional distress, and intentional infliction of emotional distress. Finally, Avery's five children bring claims for loss of companionship.

The defendants now move for summary judgment. Such a motion should be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The plain language of the rule "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Summary judgment is appropriate only if, on the record as a whole, a rational trier of fact could not find for the non-moving party. *Rogers v. City of Chi.*, 320 F.3d 748, 752 (7th Cir. 2003).

Much of the factual background set forth below is based upon Avery's version of events, the veracity of which is disputed by the defendants. For purposes of this motion, the Court views the record in the light most favorable to Avery and draws all justifiable inferences in his favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The

Court cannot weigh the evidence or decide which testimony is more credible. *McCann v. Iroquois Mem. Hosp.*, 622 F.3d 745, 752 (7th Cir. 2010). In this light, the defendants' motion for summary judgment must be denied to the extent discussed below.

**BACKGROUND**

On February 17, 1998, the partially clothed body of Maryetta Griffin, an African American female who abused crack cocaine in the Milwaukee area, was found in an abandoned garage. Griffin died as a result of manual strangulation, likely during the early morning hours of the date her body was found.

In 1998, Avery was a dope dealer, selling crack cocaine out of 2474 North Palmer Street in Milwaukee. Avery sometimes sold drugs to prostitutes through dope dating — selling drugs in exchange for sex.

In the mid-1990's, City of Milwaukee Police Detective James DeValkenaere was assigned to investigate similarities in the murders of perceived street prostitutes, drug addicts or African American women on the north side of Milwaukee, a number of whom had been strangled. During this investigation, Detective DeValkenaere was looking into the possibility that there was one individual responsible for multiple homicides based on similarities in the method of death and in the demographics of the victims. On January 9, 1996, a report was generated within the Milwaukee Police Department as a result of a task force commissioned to review 32 unsolved female homicides which occurred between 1980 and 1995 to determine whether any physical evidence existed that could benefit from DNA testing. The report concluded that there were similarities between recent asphyxiation or suffocation homicide cases of females, including: all were found in or

near vacant buildings; all victims had a history of cocaine dependency; all engaged in the practice of "dope dating;" and all frequented the same social clubs. Detectives in the homicide unit had daily briefings where they discussed the possibility that a serial killer was responsible for these murders.

**Avery interviews**

Initially, there were two people of interest in relation to the Griffin murder: Avery, and a person named Lorenzo Frost. Detective DeValkenaere and Detective Daniel Phillips interviewed Avery on March 23, 1998. During this interview, Avery told the detectives that he didn't kill Griffin and he didn't know who killed her.

According to Avery, Detectives DeValkenaere and Phillips wrote a false and fabricated police report of this interview, stating that he told them he had oral sex with Griffin on February 16, 1998, although Avery told them no such thing, and in fact never had sexual relations of any nature with Griffin. Also according to the report, Avery told DeValkenaere and Phillips that on February 16, he was in the attic of the Palmer Street residence with Griffin where they played dominos together, and she said she would be coming back later in the evening. According to Avery, and contrary to the report, Avery last saw Griffin in the early evening hours of February 16, and he had no interaction with Griffin that day while she was present at the Palmer Street residence.

Detective Phillips interviewed Avery again on March 24, this time with Detective Gilbert Hernandez. During this interview, Avery re-proclaimed his innocence and repeatedly asked to speak to a lawyer.

According to Avery, Detectives Phillips and Hernandez wrote a false and

fabricated police report of this interview with Avery, falsely stating that Avery told them he sold "dope" to Griffin February 16; that Avery told them that he was awakened by Griffin going through his pockets and pulling out his money; that he fought with Griffin; that he did not remember what happened but he told "Ronnie" that he thought he "killed this bitch;" and that he was responsible for the murder, but he did not remember.

Later in the day, Avery was interviewed by Detective Katherine Hein (n/k/a Spano). Avery repeatedly told Detective Hein that he didn't kill Griffin and didn't know who did. Detective Hein wrote a fabricated police report of her interview with Avery, falsely stating that she advised Avery of his constitutional rights; that Avery told her that the Palmer residence was used by prostitutes to receive drugs in exchange for sexual relations; that Avery told her he had oral sex, penis to mouth, with Griffin on February 16; and that Avery told her about an incident where a woman known as "Little Bit" was sent out to get alcohol one evening the previous week and falsely reported that this incident happened on February 16.

**Jailhouse informants**

Keith Randolph was an acquaintance of Avery who assisted him with legal documents while incarcerated. On March 21, 2001, Detective Timothy Heier interviewed Randolph at the Milwaukee Police Department Investigation Bureau. During the course of this interview, Detective Heier supplied Randolph with details about the Griffin homicide, coached Randolph into falsely implicating Avery in the Griffin homicide, and promised Randolph that he would help him get his sentence reduced. Detectives Hein and Hernandez did the same during an October 23, 2003 interview with Randolph at the

Stanley Correctional Institution in Stanley, Wisconsin.

Antron Kent was incarcerated during the same period of time as Avery at the Milwaukee County Jail and later at the North Fork Correctional Facility in Sayre, Oklahoma. In July and August of 2002, Detective Kevin Armbruster had more than five telephone conversations with Kent. During these phone conversations, Detective Armbruster supplied Kent with details about the Griffin homicide, coached, threatened, and pressured Kent into making false statements which implicated Avery in the murder, and promised Kent that he would help him get his sentence reduced. This process was repeated during an August 26, 2002 interview at the North Fork Correctional facility, conducted by Detectives Armbruster and Heier; an October 23, 2003 interview at the Green Bay Correctional Institution, conducted by Detectives Hernandez and Hein; and a September 7, 2004 interview at the GBCI, conducted by Detective Heier and Detective Eric Gulbrandson.[2]

Jeffrey Kimbrough was incarcerated during the same period of time as Avery at the North Fork Correctional Facility, although they never had any contact or interaction with each other. Kimbrough was Kent's cellmate and was looking for a reduction in his own criminal sentence. On August 27, 2002, Detectives Armbruster and Heier supplied Kimbrough with details about the Griffin homicide and coached and pressured him into

[2] When questioned about these interviews during his deposition, Kent invoked the Fifth Amendment and refused to answer. Adverse inferences can be drawn from Fifth Amendment silence in civil proceedings. *LaSalle Bank Lake View v. Seguban*, 54 F.3d 387, 390 (7th Cir. 1995). Such an inference, standing alone, is insufficient to create an issue of material fact that precludes summary judgment. *See, e.g., Barker v. Int'l Union of Operating Eng. Local 150,* No. 08 C 50015, 2011 WL 6338800, at *6 (N.D. Ill. Dec. 19, 2011). Here, there is more than enough evidence to corroborate the adverse inference that is raised by Kent's invocation of the Fifth Amendment.

falsely implicating Avery in the murder. The same thing happened during an October 20, 2003 interview at the Prairie Correctional Facility in Appleton, Minnesota, conducted by Detectives Hein and Hernandez.

**Legal proceedings**

On September 7, 2004, Avery was charged with first degree reckless homicide as a party to the crime, Wis. Stat. §§ 940.02(1), 939.05. On March 7, 2005, Avery was convicted following a three-day jury trial. On May 26, 2005, Avery was sentenced to an indeterminate term of not more than forty years imprisonment.

At Avery's trial, Detective Phillips testified that Avery told him that he awoke early in the morning with Griffin going through his pockets, that they fought, and that Avery said that he was responsible for the murder but did not remember how he killed Ms. Griffin. Detective Hernandez testified to the same effect.

Antron Kent testified that Avery confessed to him while they were incarcerated together. Keith Randolph confirmed that he told police about Avery's confession. On the day he was scheduled to testify, Jeffrey Kimbrough told Detective Heier that he did not want to testify against Avery. Detective Heier told Kimbrough that he "had to do it" and that there was "no going back now." Kimbrough then testified that he overheard Avery confess to Kent while they were incarcerated together.

Avery testified at his trial that he did not confess to committing the murder and that he did not make any inculpatory statements to Kent, Kimbrough or Randolph.

After Avery's trial, Detective Heier testified on behalf of Kent at a hearing related to his sentence, explaining that his cooperation and testimony helped to convict Avery.

Kent's sentence was later reduced by five years.

**Exoneration**

On April 5, 2010, Avery wrote a letter to Milwaukee County District Attorney John Chisholm seeking new testing of a DNA sample taken from Griffin's mouth. On April 19, 2010, Assistant District Attorney Norman Gahn sent Avery a letter stating that he received Avery's letter to Chisholm and that the evidence would be submitted for further testing.

On May 6, 2010, Gahn and Assistant District Attorney Mark Williams sent Avery a letter stating that the DNA sample taken from Griffin's mouth was not a match for Avery and was consistent with "another person who is charged with crimes." In May of 2010, Avery was released from prison, and on September 21, 2010, the circuit court vacated the jury's verdict and sentence. On December 12, 2012, the State of Wisconsin Claims Board granted Avery's petition for compensation under Wis. Stat. § 775.05, finding that Avery provided "clear and convincing evidence that he was innocent of the crime for which he was convicted."

**ANALYSIS**

All of the individual defendants in this case invoke qualified immunity, which shields them from liability for civil damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Estate of Escobedo v. Bender*, 600 F.3d 770, 778 (7th Cir. 2010). To determine whether the defendants are entitled to qualified immunity, the Court must analyze whether a constitutional right would have been violated on Avery's version of the

facts, and if so, whether the right was clearly established at the time of the alleged violation. *Viilo v. Eyre*, 547 F.3d 707, 709-10 (7th Cir. 2008). To be clearly established at the time of the challenged conduct, the right's contours must be "sufficiently clear that every reasonable official would have understood that what he is doing violates that right," and "existing precedent must have placed the statutory or constitutional precedent beyond debate." *Humphries v. Milwaukee Cnty.*, 702 F.3d 1003, 1006 (7th Cir. 2012). This standard "protects the balance between vindication of constitutional rights and government officials' effective performance of their duties by ensuring that officials can reasonably . . . anticipate when their conduct may give rise to liability for damages." *Rabin v. Flynn*, 725 F.3d 628, 632 (7th Cir. 2013) (quoting *Reichle v. Howards*, --- U.S. -----, 132 S. Ct. 2088, 2093 (2012)).

**Fabrication of evidence**

Avery argues that the defendants violated his clearly established due process rights by creating false written reports that he confessed, knowing that he had not, and also by manufacturing false testimony from jailhouse informants in order to corroborate the fabricated confession. The Seventh Circuit has "consistently held that a police officer who manufactures false evidence against a criminal defendant violates due process if that evidence is later used to deprive the defendant of her liberty in some way." *Whitlock v. Brueggemann*, 682 F.3d 567, 580 (7th Cir. 2012). Moreover, it was clearly established as early as 1935 that a state's presentation of testimony "known to be perjured . . . to procure the conviction and imprisonment of a defendant is as inconsistent with the rudimentary demands of justice as is the obtaining of a like result by intimidation." *Mooney v.*

*Holohan*, 294 U.S. 103, 112 (1935). Building off of *Mooney* and subsequent cases, the Seventh Circuit held it clearly established as of at least 1987 that the "deliberate manufacture of false evidence contravenes the Due Process Clause." *Whitlock* at 585; *see also Fields v. Wharrie* ("*Fields II*"), 740 F.3d 1107, 1114 (7th Cir. 2014) ("it was established law by 1985 (indeed long before) . . . that a government lawyer's fabricating evidence against a criminal defendant was a violation of due process"); *Limone v. Condon*, 372 F.3d 39, 44-45 (1st Cir. 2005) ("if any concept is fundamental to our American system of justice, it is that those charged with upholding the law are prohibited from deliberately fabricating evidence and framing individuals for crimes they did not commit").

The defendants completely ignore this controlling precedent in their opening brief. In reply, the defendants argue that *Whitlock* and *Fields II* are distinguishable because the informants in those cases initiated contact with the police. In this case, by contrast, the jailhouse informants initiated contact with the detectives. The Court fails to grasp how this is a relevant distinction. Fabricated evidence is fabricated evidence. Even if the distinction were relevant, the defendants' argument fails to account for Avery's assertion that his confession was also fabricated.

The defendants argue further that Avery's fabrication claim is barred by *Newsome v. McCabe*, 256 F.3d 747 (7th Cir. 2001), but that case involved an entirely different claim, one for malicious prosecution. Insofar as there is a "constitutional right not to be prosecuted without probable cause," such a claim is "knock[ed] out" by the "existence of a tort claim under state law." *Id.* at 750. Avery's fabrication claim does not, as the

defendants argue, amount to a claim for malicious prosecution. Perhaps it used to, *see, e.g.*, *McCann v. Mangialardi*, 337 F.3d 782, 786 (7th Cir. 2003), but no longer in light of *Whitlock* and *Fields II*. *See Petty v. City of Chi.*, 754 F.3d 416, 421 (7th Cir. 2014); *Saunders v. City of Chi.*, No. 12-cv-09158, 2014 WL 3535723, at *2 (N.D. Ill. July 11, 2014) (noting that prior to *Whitlock* and *Fields II*, courts "typically held either that fabricating evidence does not violate due process, or that fabricating evidence may violate due process, but the existence of a state law tort for malicious prosecution dictates that a plaintiff must bring his claim pursuant to state law rather than as a due process claim under Section 1983").

The defendants attempt to link *Newsome* to the instant case through the observation that in *Newsome*, the defendant police officers "encouraged two witnesses to select Newsome from a lineup – which the witnesses did, forming a vital link in the process that led to Newsome's conviction as Cohen's killer . . ." 256 F.3d at 749. If the plaintiff in *Newsome* had pressed a due process claim,[3] it likely would have failed based upon the distinction between coercion and fabrication. In "fabrication cases, the police or prosecutor manufactures evidence that he knows to be false. As we said in *Fields II* and reiterate here, a prosecutor fabricating evidence that she knows to be false is different than getting 'a reluctant witness to say what may be true.'" *Petty*, 754 F.3d at 422 (quoting *Fields II*, 740 F.3d at 1112). Thus, there is no cognizable due process claim in a coercion case, as opposed to an evidence fabrication case where there is a cognizable claim. *Id.*

---

[3] *Saunders*, 2014 WL 3535723, at *3 ("neither *Newsome* nor *McCann* addressed whether fabricated evidence violates a defendant's due process rights").

In *Fields II*, the Seventh Circuit clarified the relevant terminology. "Coerced testimony is testimony that a witness is forced by improper means to give; the testimony may be true or false. Fabricated testimony is testimony that is made up; it is invariably false. False testimony is the equivalent; it is testimony known to be untrue by the witness and by whoever cajoled or coerced the witness to give it. Much testimony is inaccurate, but not deliberately so and therefore not false or fabricated as we are using these words." 740 F.3d at 1110. Avery asserts that the defendants pressured (i.e., coerced) the jailhouse informants into saying that Avery confessed to the Griffin murder, but he also argues that the defendants and the informants all knew that Avery didn't confess. *Id.* at 1112 ("the prosecutor who was sued in *Whitlock* was part of an investigative team that told witnesses what to say *knowing that what the team was telling them was false*. This is different from coercing a reluctant witness to say what may be true") (emphasis added) (internal citations omitted). That the informants were coerced into fabricating evidence doesn't make the evidence any less fabricated. Coercion can be "an essential tool in 'persuading' a witness to fabricate testimony." *Id.* This is, quite clearly, a fabrication case, the hallmark of which is that the defendants "manufactured evidence that they knew to be false." *Petty* at 423. Avery can proceed to trial on his claim that the defendants violated his due process rights in this manner.

### *Brady v. Maryland*

Avery also argues that the defendants violated due process by not disclosing the fact that they coached and manipulated the jailhouse informants into falsely implicating

him in the Griffin murder. This claim arises under *Brady v. Maryland*, 373 U.S. 83 (1963), a "due process case that entitles criminal defendants to be shown any exculpatory evidence (including evidence usable to impeach a prosecution witness) in the possession of prosecutors, . . ." *Gauger v. Hendle*, 349 F.3d 354, 360 (7th Cir. 2003). *Brady* and its progeny apply to investigating police officers when they "withhold exculpatory evidence from prosecutors and the withholding of evidence is 'material.'" *Holland v. City of Chi.*, 643 F.3d 248, 255 (7th Cir. 2011).

In *Gauger*, the plaintiff pressed a similar argument: that detectives were required to give truthful versions of his own statements at an interrogation to the prosecutors to be forwarded to his counsel at his criminal trial. The Seventh Circuit found "the proposed extension of *Brady* difficult even to understand. It implies that the state has a duty not merely to disclose but also to create exculpatory evidence. Indeed, the duty to disclose falls out, because Gauger knew what he had said at the interrogation. The problem was not that evidence useful to him was being concealed; the problem was that the detectives were giving false evidence. Gauger wants to make every false statement by a prosecution witness the basis for a civil rights suit, on the theory that by failing to correct the statement the prosecution deprived the defendant of *Brady* material, that is, the correction itself." 349 F.3d at 360 (internal citations omitted).

Here, the duty to disclose under *Brady* "drops out" because Avery knew what he said (or didn't say) to the jailhouse informants, just like Gauger knew what he said to the interrogating police officers. *See Harris v. Kuba*, 486 F.3d 1010, 1017 (7th Cir. 2007) ("Like Gauger, Harris knew about his relationship, or lack thereof, with Davis. He was

fully capable of challenging the officers' and prosecutors' contention to the contrary"). Avery "seeks an extension of *Brady* to provide relief if a police officer makes a false statement to a prosecutor by arguing that an officer is 'suppressing' evidence of the truth by making the false statement." *Id.* The Seventh Circuit has "foreclosed this extension." *Id.*; *see also Sornberger v. City of Knoxville*, 434 F.3d 1006, 1029 (7th Cir. 2006) ("Nor can *Brady* serve as the basis of a cause of action against the officers for failing to disclose these circumstances [a coerced confession] to the prosecutor. . . . The Constitution does not require that police testify *truthfully*; rather 'the constitutional rule is that the defendant is entitled to a trial that will enable jurors to determine where the truth lies'") (emphasis in original).

**Remaining claims**

The defendants' only argument regarding the balance of Avery's claims is that they should be dismissed due to the absence of a viable, underlying due process claim. Obviously, given the foregoing analysis, summary judgment cannot be granted on that basis. The Court will also retain jurisdiction over the supplemental state law claims.

***

Avery's motion to cite additional authority [ECF No. 78] is **GRANTED**. The defendants' motion for summary judgment [ECF No. 69] is **GRANTED-IN-PART** and **DENIED-IN-PART**, consistent with the foregoing opinion.

The trial in this case is scheduled to begin on December 1, 2014. If the parties anticipate that they will be unable to complete this trial in one week (five full days), they should jointly contact the Court to discuss re-scheduling.

Dated at Milwaukee, Wisconsin, this 18th day of August, 2014.

**SO ORDERED:**

______________________

**HON. RUDOLPH T. RANDA**
**U.S. District Judge**

PLAINTIFF'S EXHIBIT 11 C

45 A

AME: AVERY, William D. 11-4-71
LAST FIRST MIDDLE D.O.B.
CIB FILE # 98-048309V

RREST DATE AND TIME:
CHARGE: STATUTE NO./ORD.NO. HOMICIDE

TATEMENT OF PRISONER CONTINUED:

On Tue 03-24-98 at appox 10am I Det Gilbert Hernandez in the presence of Det Dan Phillips advised subject of his constitutional rights which he understands. Subj states that he will make a statement. William D Avery

On Monday subj states during early morning hours subj open the door for Mercede. Subj states that he went down open the door and let Mercede in the house.

Subj states that he let Mercede walk up the stair into upper attic area. Subj states that Mercede wanted some dope which he sold her. Subj states that he doesn't know how much dope he sold Mercede.

Subj states that Mercede sat at the table, started to smoke her dope. Subj states that he was laying on the couch, fell asleep.

Subj states that he was awaken by Mercede going into his pockets, pulling out his money. Subj states that he was startle. Subj states that he got up on his feet and grabbed one of victim hands.

Subject states that Mercede and him started to fight. Subject states he was saying "what are you doing".

Subject states that Mercede pulled and ran toward the stairs, attempt to get away.

Subj states he doesn't remember what happen. Subj states "Ronnie" called. Subj told "Ronnie" get over here "I think I killed this bitch."

Subj stated that "Ronnie" shouldn't of gotten rid of the body. Question subject as to how he killed Mercede. Subj stated "I am responsible", I just don't remember how.

Det Gilbert Hernandez 3/24/98 10:60

FURNISH: Name, Rank, Payroll Number. Date and Time of Interview.

007017

PLAINTIFF'S EXHIBIT
tabbies
11 d

| | | |
|---|---|---|
| PO-15B SUPPLEMENTARY REPORT<br>MILWAUKEE POLICE DEPARTMENT | Date of Report<br>03/24/98 | Incident/Accident #<br>98-048-3098/M3431 |
| INCIDENT<br>HOMICIDE | Date of Incident/Accident<br>02/17/98 | Rep. Code # |
| VICTIM<br>GRIFFIN, MARYETTA M. | LOCATION OF INCIDENT<br>3032 N. 7TH STREET | DIST<br>5 |
| JUVENILE Last Name First | Middle | Date of Birth |
| QUANT TYPE OF PROPERTY | DESCRIPTION | SERIAL # CODE # VALUE |

This report is being dictated by Detective Gilbert HERNANDEZ, Squad 124 Early, assigned to the Criminal Investigation Bureau.

On Tuesday, March 24, 1998, at approximately 10:00AM, I, Detective HERNANDEZ, in the presence of Detective Dan PHILLIPS advised this subject of his Constitutional Rights, which he understands and this subject states that he will make a statement and at this time he affixed his signature to the report.

It should be noted that the subject referenced to is identified as AVERY, William D., M/B, dob 11/04/71.

On Monday, the subject states that during the early morning hours, that this subject opened the door for Mercedes. This subject states that he went down and opened the door and let Mercedes in the house. Subject states that he let Mercedes walk up the stairs into the upper attic area. Subject states that Mercedes wanted some dope which he sold her. Subject states that he doesn't know how much dope he sold Mercedes. Subject states that Mercedes sat at the table and started to smoke her dope. Subject states that he was laying on the couch and fell asleep. Subject states that he was awakened by Mercedes going into his pockets, and pulling out his money. Subject states that he was startled. Subject states that he got up on his feet and grabbed one of the victim's hands. States that Mercedes and him started to fight. Subject states that he was saying, "What are you doing".

Subject states that Mercedes pulled and ran toward the stairs, attempting to get away.

Subject states that he doesn't remember what happened. Subject states Ronnie called. This subject told Ronnie, "Get over here, I think I killed this bitch".

This subject stated that Ronnie shouldn't have gotten rid of the body. I questioned the subject as to how he killed Mercedes.

Subject states, "I'm responsible, I just don't remember".

It should be noted that I, Detective HERNANDEZ, while conducting this interview in the presence of Detective Dan PHILLIPS advised this subject that I would now attempt to take this summary of the subject's account and attempt to reduce it to a written report. He at this time indicated that he was not interested in signing anything and I, Detective HERNANDEZ, concluded my interview.

It should be noted the during the interview I, Detective HERNANDEZ, did show him a photo of Maryetta GRIFFIN, which he did identify as "Mercedes".

During my interview, Mr. AVERY was offered numerous cigarettes, along with black coffee. He indicated that he also did have some soda and a bologna sandwich. At the time, I, Detective HERNANDEZ, did reduce Mr. AVERY's interview to writing and upon asking him to sign it, he did indicate that he rather not and I at this time concluded this interview.

Report dictated per Detective HERNANDEZ.

GH/cml 03/25/98

| REPORTING OFFICER | PAYROLL # | LOC. CODE | SUPERVISOR SIGNATURE |
|---|---|---|---|
| Det. Gilbert Hernandez<br>DETECTIVE GILBERT HERNANDEZ | 45027 | 92 | |

Det. Daniel J. Phillips

**CERTIFICATE OF SERVICE**

I, John L. Stainthorp, hereby certify that on December 17, 2015, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

s/ John L. Stainthorp